KARL DAVID PATTERSON, By and Through His Administrator, Miller Jordan, Plaintiff v. CAROLYN DURDLE PATTERSON, Defendant v. PAULA S. PATTERSON, Intervenor and Third-Party Defendant, and TEACHERS INSURANCE ANNUITY ASSOCIATION—COLLEGE RETIREMENT EQUITIES FUND, Third-Party Defendant

No. COA99-70

(Filed 2 May 2000)

**1. Divorce— equitable distribution—retirement account— findings**

The trial court did not err in an equitable distribution action involving a retirement account by finding that the parties had advised the court that the claim had been resolved, that the parties had corresponded about the final form of a Qualified

Domestic Relations Order, and that neither party had tendered a QDRO to the court on the date on which plaintiff died.

## 2. Divorce— equitable distribution—retirement plan—conclusions supported by findings

Findings by the trial court in an equitable distribution action that plaintiff's obligation to divide his retirement account survived his death and that plaintiff's UNCC retirement plan was a "government plan" were conclusions rather than findings, as the third-party defendant contended; however, both conclusions were supported by findings.

## 3. Divorce— equitable distribution—retirement plan—QDRO—not required

A defendant in an equitable distribution action did not lose all rights she may have had in plaintiff's retirement account where plaintiff and defendant separated, the parties agreed in a consent order to a Qualified Domestic Relations Order granting defendant 20% of plaintiff's retirement account, plaintiff changed the beneficiary on the account to his new wife, and the QDRO was never entered. Plaintiff's UNCC retirement plan is a governmental plan exempt from the anti-assignment provisions of ERISA; while a QDRO constituted an approved method of effectuating a court-ordered equitable distribution of retirement benefits under the state statute, that language is permissive rather than mandatory; and language in the consent order in this case satisfied the statutory requirements. The purpose of the QDRO was to preserve defendant's interest rather than to create it; while entry of a QDRO may have been contemplated, defendant acquired an interest in the retirement plan upon execution of the consent order and that interest existed separate from any prospective QDRO.

## 4. Divorce— equitable distribution—retirement account—waiver and laches

An equitable distribution defendant's claims to a retirement account were not barred by waiver or laches where plaintiff and defendant separated; they agreed that defendant should have 20% of plaintiff's retirement account; a Qualified Domestic Relations Order to that effect was discussed but never entered; plaintiff remarried and made his new wife (the third-party defendant) the beneficiary of the account; and plaintiff passed away 5 years later. The record is not clear regarding the failure to enter the

PATTERSON v. PATTERSON

[137 N.C. App. 653 (2000)]

QDRO, but the intention to relinquish a right, necessary for waiver, has not been shown, and laches requires prejudice, which is also missing because defendant is entitled to her 20% share even without a QDRO.

Appeal by intervenor from order entered 16 October 1998 by Judge William G. Jones in Mecklenburg County District Court. Heard in the Court of Appeals 15 November 1999.

*Essex, Richards, Morris, Jordan & Matus, P.A., by G. Miller Jordan, for plaintiff-appellee Karl D. Patterson. No brief filed.*

*James, McElroy & Diehl, P.A., by Richard A. Elkins and Paul P. Browne, for defendant-appellee Carolyn D. Patterson.*

*Odom & Groves, P.C., by Thomas L. Odom, Jr., for intervenor and third-party defendant-appellant Paula S. Patterson.*

*Cansler, Lockhart, Campbell, Evans, Bryant & Garlitz, P.A., by George K. Evans, Jr., for third-party defendant-appellee Teachers Insurance Annuity Association—College Retirement Equities Fund. No brief filed.*

JOHN, Judge.

Intervenor and third-party defendant Paula S. Patterson (Paula) appeals the trial court's order denying her motions for judgment on the pleadings and summary judgment and granting defendant's motion for entry of a Qualified Domestic Relations Order (QDRO). We affirm.

Pertinent procedural and generally uncontested background information includes the following: defendant Carolyn D. Patterson (Carolyn) and Karl D. Patterson (Karl) were married 30 August 1963. For many years during the marriage, Karl worked as a professor at the University of North Carolina at Charlotte (UNCC). During his employment at UNCC, Karl participated in a retirement plan offered by the university (the UNCC retirement plan) and administered by Teachers Insurance Annuity Association and College Retirement Equities Fund (TIAA-CREF).

Carolyn and Karl separated 8 July 1986, Karl filed a divorce complaint (the district court case) 22 February 1988, Carolyn counterclaimed therein for equitable distribution, and the divorce was granted 25 April 1988. Carolyn's equitable distribution claim was

subsequently settled by means of a "Consent Order and Judgment" (the Consent Order) filed 18 March 1991.

Relevant provisions of the Consent Order included the following:

The parties stipulate and agree that in order to effectuate the terms of this Consent Order and Judgment, a [QDRO] will need to be prepared and entered by the Court so as to grant to [Carolyn] a twenty percent (20%) interest in [Karl's] retirement plan with TIAA-CREF, valued as of the date of the separation of the parties. The parties stipulate and agree that the Court shall retain jurisdiction so as to enter such QDRO when prepared.

. . . .

This Court expressly retains jurisdiction to enter all such [QDRO's] as may be necessary to preserve to [Carolyn] a twenty percent (20%) interest in [Karl's] TIAA-CREF retirement plan, further preserving to [Carolyn] all of her rights to such retirement plan as set forth under the provisions of N.C.G.S. § 50-20[(b)(3) (1987)].

In addition, a Property Settlement Agreement (the Agreement) executed by Carolyn and Karl was incorporated by reference into the Consent Order. The Agreement contained the following pertinent provisions:

[Karl] is a participant in a retirement plan [the TIAA-CREF plan] . . . . The parties have stipulated and agreed that [Carolyn] shall be granted a twenty percent (20%) share of said retirement plan, valued as of the date of separation of the parties . . . . In order to preserve to [Carolyn] her twenty percent (20%) share of the TIAA-CREF [plan], it will be necessary to have the Court enter a [QDRO] . . . . [Carolyn] shall be responsible for the preparation of said QDRO, and [Karl] shall cooperate with [Carolyn] so that such preparation may be done expeditiously. [Karl] shall execute all such documents as may be necessary to place such QDRO in effect.

. . . .

Except [as] otherwise provided herein, all the provisions of this Agreement shall be binding upon the heirs, next of kin, executors and administrators of each party.

Meanwhile, Karl married Paula 16 February 1990 and named her sole beneficiary of the UNCC retirement plan. Karl died intestate 19 November 1996. No QDRO had been entered pursuant to the Agreement and Consent Order prior to Karl's death.

Paula was named administratix of Karl's estate 31 January 1997. On 26 March 1997, Carolyn filed a motion in the district court case, requesting "entry of a mandatory injunction requiring [Karl's estate] to consent to the entry of the [QDRO]" envisioned earlier. Carolyn thereby sought preservation of her twenty percent interest in the proceeds of the UNCC retirement plan, valued as of the date she and Karl separated, *see* N.C.G.S. § 50-20(b)(3) (1987) (award of pension benefits shall be determined "using the proportion of time the marriage existed . . . up to the date of separation of the parties"); *see also* 1987 N.C. Sess. Laws ch. 663, §§ 1, 2 (amendments to G.S. § 50-20(b)(3) effective 1 October 1987 and applicable to actions for absolute divorce filed on or after that date (Karl's divorce action herein filed 22 February 1988)). Carolyn's interest hereinafter will be denominated simply as "twenty percent" without specifying that such interest must be valued as of the date of separation.

On 21 May 1997, Paula initiated a separate action in superior court (the superior court case) against Carolyn and TIAA-CREF, "requesting a declaratory judgment as to the TIAA-CREF funds in dispute." In a subsequent motion to intervene in the district court case, Paula alleged that, in consequence of Carolyn's March 1997 motion, "TIAA-CREF has not disbursed to [Paula] funds she is entitled to as primary beneficiary" of the UNCC retirement plan.

A stay was entered in the superior court case 6 August 1997 pending resolution of Carolyn's motion in the district court case. By order dated 29 December 1997, the district court (1) substituted Karl's estate, Miller Jordan by that point having been designated administrator, as named plaintiff in lieu of Karl in the underlying district court case; (2) allowed Paula to intervene therein; and, (3) joined both Paula and TIAA-CREF as third-party defendants.

On 16 October 1998, the district court (hereinafter, the trial court), upon rendering extensive factual findings, (1) granted Carolyn's motion for entry of a QDRO and ordered Karl's estate "to authorize TIAA-CREF to transfer to [Carolyn] 20% of the value of the TIAA-CREF account;" (2) "declare[d] Carolyn . . . to be the owner of a 20% share of the TIAA-CREF account;" (3) denied Paula's previously submitted motions for judgment on the pleadings and summary judg-

ment; and, (4) retained jurisdiction over the cause for the purpose of entering the QDRO. Paula timely appealed, citing seven assignments of error.

[1] Preliminarily, we address Paula's contentions relating to certain of the trial court's findings of fact (findings). Paula first challenges the following portions of findings 9 and 13 "because these findings of fact are not supported by competent evidence:"

> 9. Prior to [Carolyn's] claim for equitable distribution being called for trial, [Karl and Carolyn] advised the Court, through counsel, that the claim had been resolved and compromised. The parties' attorneys at that time were Alan P. Krusch for [Karl] and Paul A. Reichs for [Carolyn]. The parties, through counsel, submitted a Consent Order and Judgment to the Court which was entered on March 18, 1991. . . .

> . . . .

> 13. For a number of months following the entry of the Consent Order and Judgment, the parties' attorneys . . . corresponded with one another regarding the final form of the [QDRO] as contemplated by the parties in their settlement. Drafts of a proposed [QDRO] were prepared and exchanged. [Carolyn] remained in contact with her attorney throughout this period, inquiring about the status of the [QDRO]. Nevertheless, as of the date on which [Karl] died . . ., neither party had tendered to the Court a [QDRO] effecting the division of the TIAA-CREF [plan] as agreed and ordered.

With respect to finding 9, Paula asserts

> there is no affidavit from Carolyn, [or either of the named attorneys] to support the alleged conversation with the Court. Neither is there a transcript to support these findings.

Paula's first argument borders on the frivolous.

The Consent Order itself, filed 18 March 1991 and signed by Carolyn, Karl and Judge William G. Jones, the trial judge in the case *sub judice*, expressly stated that the parties

> advised the Court that all matters in controversy between the parties with respect to their claims for equitable distribution of marital property have been settled, compromised and agreed. . . .

This provision alone, attested to by Carolyn and Karl, suffices to sustain the challenged portion of finding 9. *See Brandon v. Brandon*, 132 N.C. App. 646, 652, 513 S.E.2d 589, 593 (1999) (findings of trial court are conclusive on appeal if supported by competent evidence).

Likewise, competent evidence in the record supports finding 13. Carolyn submitted copies of correspondence between original counsel for Karl and Carolyn as part of her response to Paula's request for production of documents (the document response). The letters, dating from 1988 until April 1992, indicated counsel had communicated regarding the QDRO for more than a year following filing of the Consent Order, and that Carolyn had been in contact with her attorney during this period as well. Included among the correspondence was a proposed QDRO, and Carolyn stated in the document response that, upon reviewing her attorney's files, she had "determined that a number of drafts of the [QDRO] were exchanged between the attorneys."

While not necessarily insisting the foregoing fails to support finding 13, Paula instead attacks the competency thereof, arguing (1) Carolyn's document response was unverified and therefore not an affidavit, and that, (2) even if considered an affidavit, Carolyn's assertions in her document response constituted hearsay and the attached documents were unauthenticated. These contentions lack merit.

First, Paula neglected to raise the issues of hearsay or authentication in the trial court, thereby failing to preserve such matters for appellate review. *See* N.C.R. App. P. 10(b)(1) ("[i]n order to preserve a question for appellate review, a party must have presented to the trial court a timely request, objection or motion. . . .").

Moreover, assuming *arguendo* both preservation of the question for our consideration and that an affidavit was indeed required, the record contains an affidavit by Carolyn specifically incorporating by reference her document response as well as the attachments thereto.

To incorporate a separate document by reference is to declare that the former document shall be taken as part of the document in which the declaration is made, as much as if it were set out at length therein.

*Booker v. Everhart*, 294 N.C. 146, 152, 240 S.E.2d 360, 363 (1978). Carolyn's document response therefore must be regarded as part of her later affidavit. *See id.*

PATTERSON v. PATTERSON

[137 N.C. App. 653 (2000)]

**[2]** Paula next maintains the following portions of findings 11 and 16 "are not findings of fact but conclusions of law [and are] not supported by competent evidence":

> 11. The above provisions, as part of the Court's Consent Order and Judgment dated March 18, 1991, establish that *[Karl's] obligation to divide the TIAA-CREF account survived his death, and that this obligation is binding upon his heirs, including [Paula].*
>
> . . . .
>
> 16. . . . *The UNCC plan* was established by the State of North Carolina for the employees of its university, and therefore *constitutes a "governmental plan" within the meaning of the Employees Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1002(32). Since "governmental plans" are expressly excluded from coverage by [ERISA], 29 U.S.C. § 1003(b)(1), the UNCC plan is not subject to the requirements of ERISA.*

(emphasis added).

Paula correctly characterizes the preceding italicized portions as conclusions of law and we therefore treat them as such on appeal. *See Britt v. Britt*, 49 N.C. App. 463, 470, 271 S.E.2d 921, 926 (1980) ("[a]lthough designated as a finding of fact, the character of this statement is essentially a conclusion of law and will be treated as such on appeal"). However, she further suggests the italicized conclusions are not supported by the trial court's findings. *See Brandon*, 132 N.C. App. at 653, 513 S.E.2d at 594 ("trial court's findings of fact must support its conclusions of law"). We do not agree.

The challenged conclusion in "finding" 11 is amply supported by finding 10, which contains "[t]he above provisions" referred to in finding 11. The reference is to sections of the Consent Order and Agreement previously set out herein, and it appears the trial court was simply interpreting those provisions in reaching its legal conclusion.

The conclusion of law included in "finding" 16 describes the UNCC retirement plan as a government plan and therefore exempt from ERISA. However, this conclusion is supported by the remaining portions of finding 16 reciting that the UNCC retirement plan "was established by the State of North Carolina for the employees of its

university," and by certain other findings unchallenged by Paula. Finding 21, for example, states that

> TIAA-CREF provides funding for a retirement plan established pursuant to Chapter 135 of the North Carolina General Statutes, which covers professors employed at

UNCC, and finding 29 makes reference to Karl's "optional retirement plan adopted by the University of North Carolina," both supporting the court's conclusion that the UNCC retirement plan was governmental.

[3] We turn now to the heart of the instant appeal, Paula's third assignment of error asserting

> Carolyn lost all possible rights she may have had to the TIAA-CREF funds by her failure to have a QDRO entered prior to Karl's death. . . .

According to Paula, she "is entitled to the TIAA-CREF funds by virtue of her status as sole beneficiary" of the UNCC retirement plan, and further this Court should reverse the trial court and remand for entry of judgment "declaring [Paula] as a matter of law the sole owner of and solely entitled to the death benefits payable from the TIAA-CREF annuities." Paula is mistaken.

We first emphasize that the trial court correctly determined that the UNCC retirement plan was a "governmental plan" not subject to federal regulation under provisions of the Employee Retirement Income Security Act, codified at 29 U.S.C. § 1001 *et seq.* (1994) (ERISA). ERISA contains a preemption clause stating that the provisions thereof "shall supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan," 29 U.S.C. § 1144(a), unless specifically exempted from coverage.

> Governmental plans are defined in the federal statute as

> plan[s] established or maintained for its employees by the Government of the United States, by the government of any State or political subdivision thereof, or by any agency or instrumentality of any of the foregoing.

29 U.S.C. § 1002(32). "Governmental plans" are pointedly exempted from ERISA coverage, 29 U.S.C. § 1003(b)(1), and notably from the "anti-assignment" provision allowing benefits to be distributed to the

spouse of a participant only pursuant to a court order meeting certain specified criteria, 29 U.S.C. § 1056(d)(3)(A), *i.e.*, a QDRO.

The trial court's determination in finding 16 that the UNCC retirement "plan was established by the State of North Carolina for the employees of its university" has been discussed above. Significantly, Paula has not maintained this portion of the finding was not supported by competent evidence; it is therefore binding on appeal. *See Steadman v. Pinetops*, 251 N.C. 509, 514-15, 112 S.E.2d 102, 106 (1960) (findings of fact to which no exceptions are made "are presumed to be supported by competent evidence and are binding on appeal").

In addition, Paula concedes in her appellate brief that the UNCC retirement plan was "established pursuant to Chapter 135 of the North Carolina General Statutes." Paula is referring to N.C.G.S. § 135-5.1 (1999), originally enacted in 1971, which provides:

(a) An Optional Retirement Program provided for in this section is authorized and established and shall be implemented by the Board of Governors of The University of North Carolina . . . for the benefit of administrators and faculty . . . .

In short, the UNCC retirement plan is a governmental plan exempt from the anti-assignment provisions of ERISA. *See* 29 U.S.C. §§ 1002(32), 1003(b)(1); *see also Roy v. Teachers Ins. and Annuity Ass'n*, 878 F.2d 47 (2nd Cir. 1989) (plan established by New York State Legislature for benefit of professional employees of State University of New York, with TIAA-CREF as the designated insurer, was a governmental plan and thus exempt from ERISA); *cf. In re Marriage of Norfleet*, 612 N.E.2d 939 (Ill. App. Ct. 1993) (retirement account subject to ERISA may be "assigned or alienated" only by means of a QDRO, 29 U.S.C. § 1056(d)(3)(A)).

We therefore turn to applicable provisions of state law. N.C.G.S. § 135-9 (1999) provides that

[e]xcept . . . *in connection with a court-ordered equitable distribution under G.S. [§] 50-20*, the right of a person to a pension, or annuity, or a retirement allowance, to the return of contributions, the pension, annuity or retirement allowance itself, any optional benefit or any other right accrued or accruing to any person under the provisions of this Chapter . . . are exempt from levy and sale, garnishment, or any other process whatsoever, and

shall be unassignable except as in this Chapter specifically otherwise provided.

(emphasis added). Karl's interest in the UNCC retirement plan was therefore assignable "in connection with a court-ordered equitable distribution" pursuant to G.S. § 50-20. *Id.*

Compared with the rigid limitation on assignment in ERISA, *see* 29 U.S.C. § 1056(d)(3)(A), the broad language of G.S. § 135-9, coupled with the relevant provisions of G.S. § 50-20 considered below, indicate that assignment of a state retirement plan under the North Carolina statutory scheme may be effected by court orders other than a QDRO. In this context, we note Congress added the anti-assignment exception for QDROs to ERISA in 1984. *See* Retirement Equity Act of 1984, Pub. L. No. 98-397, § 104, 98 Stat. 1426, 1433-36 (1984) (codified at 29 U.S.C. § 1056(d)(3)(A)). G.S. § 135-9 was amended the next year to incorporate the anti-assignment exception for "court-ordered equitable distribution[s]." *See* 1985 N.C. Sess. Laws ch. 402, § 1. Had the General Assembly wished to limit the exception to QDROs, it could have followed the example presented in ERISA and employed much narrower language. *See Edmisten, Attorney General v. Penney Co.*, 292 N.C. 311, 316, 233 S.E.2d 895, 898 (1977) (by modifying language from similar federal act, "North Carolina legislature must have intended to alter its meaning").

The version of G.S. § 50-20 applicable to the instant case provides that

[t]he distributive award of vested pension, retirement, and other deferred compensation benefits may be made payable:

. . . .

c. As a prorated portion of the benefits made to the designated recipient at the time the party against whom the award is made actually begins to receive the benefits. . . .

. . . The award shall be based on the vested accrued benefit . . . calculated as of the date of separation. . . .

. . . .

*The Court may require distribution of the [pension] award by means of a qualified domestic relations order,* as defined in section 414(p) of the Internal Revenue Code of 1986. . . .

G.S. § 50-20(b)(3) (1987) (emphasis added).

Thus the plain meaning of the applicable version of the statute, *see Frye Reg'l Med. Ctr. v. Hunt*, 350 N.C. 39, 45, 510 S.E.2d 159, 163 (1999) (if language of statute is clear, courts must give statute its plain meaning), is that trial courts might utilize QDROs to distribute pension awards, but that QDROs were not the sole mechanism available. As our Supreme Court has stated,

> the use of "may" generally connotes permissive or discretionary action and does not mandate or compel a particular act.

*Campbell v. Church*, 298 N.C. 476, 483, 259 S.E.2d 558, 563 (1979). To summarize, while QDROs constituted an approved method of effectuating a "court-ordered equitable distribution" of retirement plan benefits under G.S. § 135-9, the governing statutory language was permissive (presumably to allow trial courts to observe the strictures of ERISA) rather than mandatory.[1]

In the case *sub judice*, the Consent Order, once signed and entered by the trial judge, became a "court-ordered equitable distribution" for purposes of G.S. § 135-9. *See White v. White*, 289 N.C. 592, 596, 223 S.E.2d 377, 380 (1976) ("[t]hat the order is based on an agreement of the parties makes it no less an order of the court once it is entered"). Carolyn and Karl therein

> stipulated and agreed that [Carolyn] shall be granted a twenty percent (20%) share of [Karl's] retirement plan, valued as of the date of separation of the parties. . . .

This language alone, incorporated into the Consent Order executed by the trial court pursuant to an equitable distribution claim, satisfied the requirements of G.S. § 135-9 to effectuate a valid assignment of retirement benefits. No QDRO was required.

Although decided under ERISA, *Evans v. Evans*, 111 N.C. App. 792, 434 S.E.2d 856, *disc. review denied*, 335 N.C. 554, 439 S.E.2d 144 (1993), supports this conclusion. Robert and Peggy Evans entered into a property settlement agreement which was incorporated into a consent judgment. *Id.* at 793, 434 S.E.2d at 858. The agreement provided Peggy would "receive as alimony thirty percent (30%) of all income from [Robert's] pension or retirement plan" at his retirement. *Id.* at 794, 434 S.E.2d at 858. Although complying with other alimony

---

1. In this regard, we note the statute has recently been amended and now reads as follows: "[t]he court may require distribution of the [pension] award by means of a qualified domestic relations order . . . *or by other appropriate order* . . . ." N.C.G.S. § 50-20.1(g) (1999) (emphasis added).

provisions during his employment, Robert failed to make the required payments upon his retirement and Peggy filed motions seeking an order of compliance and that Robert be held in contempt. *Id.*

Robert's private pension plan was subject to ERISA and he argued that any purported assignment thereof was void under the version of the federal statute (not containing the current exemption allowing assignment by means of a QDRO) in effect at the time the parties' agreement was executed. *Id.* at 795, 434 S.E.2d at 858-59. This Court, however, construed the applicable version of ERISA as containing

an implied exemption to the anti-assignment provision . . . for domestic relation decrees authorizing the transfer of retirement benefits in satisfaction of support obligations. . . .

Since the 1981 [consent] judgment in the case at bar and the implied exception followed by the majority of jurisdictions, Congress has amended the anti-alienation clause of ERISA. Known as the Retirement Equity Act of 1984 . . . Congress amended [29 U.S.C.] § 1056(d) by creating an exception for certain domestic relations orders . . . which were determined to be qualified domestic relations orders. . . . The 1984 amendment, however, has no retroactive effect on the 1981 judgment at issue.

*Id.* at 796-97, 434 S.E.2d at 859-60.

Thus, under the earlier version of ERISA which did not specifically require a QDRO to assign an interest in pension benefits, the simple language of the parties' agreement incorporated into a court order adequately secured Peggy's interest in Robert's pension. Robert was ordered to pay Peggy one-third of his retirement payout. *Id.* at 797, 434 S.E.2d at 860.

Similarly, in the instant case, because the applicable versions of G.S. §§ 135-9 and 50-20(b)(3) did not mandate entry of a QDRO to assign a retirement plan, the plain language of the Agreement incorporated into the Consent Order served to secure Carolyn's twenty percent interest.

[S]eparation agreements incorporated into court decrees are construed and interpreted in the same manner as other contracts,

*Britt,* 49 N.C. App. at 468, 271 S.E.2d at 925, as are assignment clauses, *Martin v. Ray Lackey Enterprises,* 100 N.C. App. 349, 354, 396 S.E.2d 327, 330 (1990).

PATTERSON v. PATTERSON

[137 N.C. App. 653 (2000)]

When parties use clear and unambiguous terms, a contract can be interpreted by the court as a matter of law.

*Id.*

The provisions of the Agreement are indeed "clear and unambiguous," *id.*: Carolyn "shall be granted a twenty percent (20%) share of [Karl's] retirement plan." Further, while entry of a QDRO may have been contemplated, the Consent Order reflects that Carolyn's interest existed separate from any prospective QDRO:

> In order to preserve to [Carolyn] her said twenty percent (20%) share of the TIAA-CREF Retirement Plan, it will be necessary to have the Court enter a [QDRO]. . . .

The purpose of the QDRO was to "preserve" Carolyn's interest, not create it.

Parenthetically, we observe that insertion of the QDRO provision at issue may have been for the purpose of avoiding the circumstance in *Evans*. The pension benefits therein were disbursed to the husband, who in turn was required to disburse a thirty percent share to his former spouse. *Evans*, 111 N.C. App. at 794, 434 S.E.2d at 858. Use of a QDRO permits pension benefits to flow directly from the insurer to both parties in the proportion ordered by the court, thereby "preserving" the rights of the assignee (herein Carolyn) without having to rely upon the assignor to effectuate distribution.

In any event, we conclude it to be immaterial whether a QDRO was entered before Karl's death because Carolyn acquired an interest in the UNCC retirement plan upon execution of the Consent Order. Paula's argument therefore fails. As the trial court properly stated in its 16 October 1998 order,

> by contractually agreeing to transfer 20% of the TIAA-CREF accounts to [Carolyn], and by consenting to the entry of the March 18, 1991 Order, [Karl] transferred at that time all of his right, title and interest in that portion of the accounts to [Carolyn]. Any interest that Paula Patterson had in the accounts as of the date of [Karl's] death was taken subject to the terms of the Court's prior order.

[4] Having determined Carolyn retained an interest in the UNCC retirement plan, we now consider whether the trial court erred in

granting Carolyn's motion for entry of a QDRO to facilitate payment thereof. Addressing this issue, Paula contends in her remaining assignments of error that "Carolyn's claims are barred by the equitable doctrines of waiver and laches," and that the trial court lacked subject matter jurisdiction (1) "to substitute the estate of Karl as a defendant;" (2) "to enter a QDRO;" or, (3) "to require the estate to enter into a QDRO after Karl's death." Paula's concluding arguments are unavailing.

Although more than five years passed between entry of the Consent Order and Karl's death, we cannot agree with Paula that failure to enter the QDRO "was due solely to [Carolyn] or [Carolyn's] then attorneys' negligence and neglect." The trial court rendered no such finding, but, as noted above, simply recited in finding 13 that counsel for Karl and Carolyn had "corresponded with one another" for "a number of months" with no QDRO being entered. Moreover, although the Agreement designated Carolyn and her attorney as "responsible for the preparation of said QDRO," Karl and his attorney were similarly required to "cooperate" so that the QDRO might be prepared "expeditiously."

Frankly, the record is not clear regarding the reasons underlying failure of the QDRO to be entered prior to Karl's death, five years after execution of the Consent Order. Nonetheless, it goes without saying that the present controversy could have been avoided in its entirety had original counsel diligently fulfilled their responsibilities.

In any event, the doctrines of waiver and laches do not serve to block the trial court's belated directive that a QDRO be entered. Waiver

is always based upon an express or implied agreement. There must always be an *intention* to relinquish a right, advantage, or benefit. The intention to waive may be expressed or implied from acts or conduct that naturally lead the other party to believe that the right has been *intentionally* given up.

*Klein v. Insurance Co.*, 289 N.C. 63, 68, 220 S.E.2d 595, 598-99 (1975) (emphasis added). Paula has presented no evidence of an intent on Carolyn's part to waive her right under the Consent Order and Agreement to entry of a QDRO or of any action by Carolyn that would imply such intent, but rather insists that "neglect" by Carolyn caused the failure of the QDRO to be entered. Waiver is thus not present herein.

Regarding laches, this Court has held that

> [t]he defense of laches will bar a claim when the plaintiff's delay in seeking a known remedy or right has resulted in a change of condition which would make it unjust to allow the plaintiff to prosecute the claim. . . .
>
> . . . The doctrine of laches, however, is not based upon mere passage of time; it will not bar a claim unless the delay is (I) unreasonable and (ii) injurious or prejudicial to the party asserting the defense.

*Cieszko v. Clark*, 92 N.C. App. 290, 297, 374 S.E.2d 456, 460 (1988).

Although the party asserting laches bears the burden of proof thereon, *Harris & Gurganus v. Williams*, 37 N.C. App. 585, 588, 246 S.E.2d 791, 794 (1978), neither Paula's appellate brief nor the record contain any indication of prejudice. Given our holding that Carolyn is entitled to her twenty percent share of the UNCC retirement plan even absent a QDRO, moreover, we cannot envision how the trial court's order requiring a QDRO to be entered would work any prejudice to Paula. With or without a QDRO, Paula would receive only her eighty percent share of the proceeds of the UNCC retirement plan. Absent prejudice, there can be no defense of laches. *Cieszko*, 92 N.C. App. at 297, 374 S.E.2d at 460.

Regarding Paula's challenge to the trial court's subject matter jurisdiction, we note initially that she has failed in her appellate brief to support her argument with relevant citations to authority. *See* N.C.R. App. P. 28(b)(5) ("[a]ssignments of error . . . in support of which no . . . authority [is] cited will be taken as abandoned"); *see also Peace River Electric Cooperative v. Ward Transformer Co.*, 116 N.C. App. 493, 510, 449 S.E.2d 202, 214 (1994) (this Court not required to consider assignments of error unsupported by citation to authority), *disc. review denied*, 339 N.C. 739, 454 S.E.2d 655 (1995).

In any event, suffice it to point out that the Consent Order expressly provided that the trial court retained jurisdiction to enter a QDRO:

> [this court] retain[s] jurisdiction to enter such Qualified Domestic Relation Order or Orders as may be necessary to effectuate the terms of the agreement of the parties.
>
> . . . .

This cause is retained pending further orders of the Court.

*See also Wildcatt v. Smith*, 69 N.C. App. 1, 11, 316 S.E.2d 870, 877 (1984) (trial court "retains jurisdiction to correct or enforce its judgment").

Further, the Agreement executed by Karl and Carolyn and incorporated by reference into the Consent Order denominated not only the grant of Carolyn's twenty percent interest in the UNCC retirement plan, but also expressly anticipated the court's entry of a QDRO to "preserve" that interest. Significantly, the Agreement also stated that

all the provisions of this Agreement shall be binding upon the heirs, next of kin, executors and administrators of each party,

thus binding Karl's estate to the terms of the Consent Order.

To conclude, any assignments of error or arguments not addressed are overruled, and the order of the trial court appealed from is affirmed.

Affirmed.

Chief Judge EAGLES and Judge HUNTER concur.