**42 EAST, LLC v. D.R. HORTON, INC.**

[218 N.C. App. 503 (2012)]

42 EAST, LLC, Plaintiff v. D.R. HORTON, INC., Defendant

No. COA10-1570

(Filed 7 February 2012)

**1. Contracts—home construction—closing date—extension of time—time of the essence**

The trial court erred in a breach of contract case arising out of a home building contract by concluding that defendant breached the contract. The findings and conclusions were inadequate to determine if the required closing date had been extended or if the "time is of the essence" clause was breached or waived.

**2. Contracts—home construction—termination of agreement**

The trial court erred in a breach of contract case arising out of a home building contract by concluding that defendant did not properly terminate the contract. The trial court was required to determine whether defendant properly terminated the contract under sections 40 and 5 of the agreement, but did not address whether defendant properly terminated the agreement under section 40. Furthermore, the trial court did not address whether defendant acted in good faith and in the exercise of honest judgment under section 40.

**3. Contracts—home construction—findings of fact—misapprehension of law**

The trial court erred in a breach of contract case arising out of a home building contract by concluding that defendant breached the contract. Because the trial court made its findings of fact under a misapprehension of law, the order was vacated and remanded to the trial court.

Appeal by defendant from judgment entered 10 May 2010 by Judge Robert H. Hobgood in Wake County Superior Court. Heard in the Court of Appeals 17 August 2011.

*Manning, Fulton & Skinner, P.A., by Robert S. Shields, Jr. and Katherine M. Bulfer, for plaintiff-appellee.*

*Smith Moore Leatherwood LLP, by Sidney S. Eagles, Jr., Stephen W. Petersen, and Elizabeth Brooks Scherer, for defendant-appellant.*

GEER, Judge.

Defendant D.R. Horton, Inc. ("Horton") appeals from the Order and Rule 52(a) Judgment entered against Horton and in favor of plaintiff 42 East, LLC ("42 East") after a bench trial. Because (1) the order did not resolve all the issues necessary to determine Horton's liability, (2) the findings of fact were made under a misapprehension of the law, and (3) some of the findings are not supported by the evidence, we vacate and remand for further findings of fact and conclusions of law.

## Facts

Horton is the nation's largest homebuilder. This case arises out of a Lot Purchase Agreement ("the Agreement") entered into by 42 East and Horton on 19 May 2006 that anticipated Horton would purchase 273 fully developed residential lots owned by 42 East for a total price of $10,828,300.00. The initial Agreement provided for five successive closings with Horton purchasing at each closing an approximately equal number of lots.

Within five business days of the effective date of the Agreement, the parties executed an escrow agreement pursuant to which Horton deposited, as earnest money, a letter of credit with the escrow agent in the amount of $400,000.00 naming 42 East as the beneficiary. The Agreement provided that in the event Horton defaulted in the performance of any of its obligations under the Agreement, then 42 East's "sole and exclusive remedy" would be to receive payment of the letter of credit as liquidated damages.

Horton's obligation to close on the purchase of the lots was contingent on certain specified conditions, including the following contained in Section 5(b) of the Agreement:

5. Contingencies.

. . . .

b. Conditions to Buyer's Obligation to Close. Buyer's obligation to close on the purchase of Lots under this Agreement is contingent upon satisfaction of all of the following conditions (collectively, the "Conditions to Closing")[:] . . . (6) Seller shall deliver good and marketable title to the Property to Buyer and the Title Company shall be unconditionally prepared to issue a standard ALTA owner's form title insurance policy insuring good and marketable fee simple title to the Property with a lia-

bility limit in the amount of the Purchase Price at standard premium rates . . . .

"Good and marketable title" was defined by Section 8 of the Agreement as "title that is insurable by the title insurance company designated by [Horton] . . . under a standard ALTA owner's form at standard rates, free and clear of all liens, encumbrances and other exceptions to title and rights of others . . . . " Section 8 of the Agreement further provided that 42 East would have until closing to cure all title objections, at their sole cost.

Section 9 of the Agreement allowed for a 60-day inspection period during which Horton's agents, consultants, and contractors could enter upon and inspect the property and conduct any tests and studies that Horton deemed necessary or appropriate. Section 9 further specified that "[t]he results of all inspections, tests, examinations and studies of the Property performed during the Inspection Period and the Covenants, Site Plan, Subdivision Plans, Grading Plan, Drainage Plan, and the plans and design for the Private Sewer System must be suitable to [Horton], in its sole discretion." If, on or before the end of the 60-day period, Horton did not deliver a written "Notice of Suitability," then the Agreement would "automatically terminate on that date."

Originally, the Agreement provided that the first closing would occur between 1 November 2006 and 31 December 2006. The parties, however, entered into a First Amendment to the Agreement on 25 August 2006 delaying the initial closing date due to water and sewer issues unrelated to the current dispute.

In addition, by mutual agreement, the parties extended the inspection period to 9 October 2006. On 2 October 2006, Chris Crowson, the attorney doing the title work on the property for Horton, notified 42 East of Horton's objections regarding the title of the property. Mr. Crowson had particular concern about certain issues because he perceived that they would be difficult to resolve. Those issues included an easement identified as the "18' Cart Path Easement"; a pathway called the "Needham Path" crossing over a 186.14 acre tract that makes up a portion of the property; and assignments of leases and rents to Four Oaks Bank & Trust Co. that were never cancelled.

Horton sought title insurance for the property from Investors Title Insurance Company. Investors Title prepared a commitment letter to Horton in September 2006 advising defendant of the terms of

the title insurance policy, including the exceptions it would make to its coverage—in other words, items for which Investors Title would not be obligated to provide coverage if any claim were made on those exceptions.

Although Horton's normal practice was to deal with significant title issues during the inspection period, Horton, on the advice of Mr. Crowson, decided to propose a Second Amendment to the Agreement rather than just further extending the inspection period. The Second Amendment, executed 6 October 2006, not only moved the inspection period expiration date to 23 October 2006, but also added a section 40 to the Agreement that Horton believed would be its "best remedy" and would give the company the "protection" it needed regarding the title issues.

Section 40 provided:

> 40. **Additional Contingency**. Buyer's obligation to close on the purchase of Lots under this Agreement is contingent upon Buyer's receipt from Seller of evidence in a form acceptable to Buyer that all of the objections to title to the Property listed in **Exhibit H** attached hereto and incorporated herein have been cured or removed ("the Additional Contingency"). Should this Additional Contingency not be satisfied or waived in writing by Buyer prior to each Closing, then Buyer, at its option, may terminate this Agreement by giving written Notice to Seller, in which event, all of the Earnest Money on deposit with Escrow Agent shall be immediately refunded to Buyer.

In turn, Exhibit H listed in substantially similar form the objections set forth in Mr. Crowson's 2 October 2006 letter. On 12 October 2006, Horton issued a "Notice of Suitability" for the property in which it stated that the property was suitable for purchase.

In addition to the title issues, various other factors unrelated to Horton's activities at the site—such as the sewer system, roadway design, and grading—were causing delays on the project. On 23 May 2007, Horton's on-site manager at the time, Scott Morrison, sent an email to Mr. Crowson discussing a new "take down" schedule for purchase of the lots on the project. The parties amended the Agreement for a third time on 18 September 2007. That amendment doubled the number of closings from five to ten and substantially reduced the number of lots to be closed at each closing, reducing Horton's purchase price at the initial closing by $1,000,000.00. The Third Amendment also set a new initial closing date of 28 November 2007.

**42 EAST, LLC v. D.R. HORTON, INC.**

[218 N.C. App. 503 (2012)]

Shortly after the execution of the Third Amendment, the parties began discussing a fourth amendment to the Agreement in light of the deteriorating real estate market. In fact, Horton ultimately lost $700,000,000.00 for fiscal year ending 31 December 2007.

On 5 December 2007, Mr. Morrison sent the terms of a proposed Fourth Amendment to Mr. Crowson and requested that he prepare that amendment. On 18 December 2007, Mr. Crowson emailed Mr. Morrison a proposed draft that set a new initial closing date of 20 January 2008, extended the takedown schedule for the project from 2 March 2010 to 20 October 2012, and provided that Horton would purchase 5 rather than 10 lots per month. Although Horton challenges the finding of fact, the trial court found that "[a]s of December 18, 2007, Gary Lynch, on behalf of the Plaintiff, and Scott Morrison and John Nance, Vice President of Land Acquisition and Development for Defendant, and Kurt Burger, Regional Vice President of Defendant, had agreed to the terms of the Fourth Amendment."

On 21 December 2007, however, Horton instructed Mr. Crowson to put 42 East in default on the project. Section 27 of the Agreement provided that 42 East had 45 days—or until 7 February 2008—in which to cure any alleged default.

On 4 January 2008, Larry Kristoff, attorney for 42 East, wrote Mr. Crowson responding to each of Mr. Crowson's objections to title. Between the execution of the Second Amendment and Mr. Kristoff's letter, there had been no discussions regarding the objections to title. After receiving Mr. Kristoff's letter, Mr. Crowson discussed with Investors Title what would need to be done to resolve the remaining objections to title to Investors Title's satisfaction, especially what was required to remove the Needham Path exception from the title insurance policy.

Mr. Crowson then discussed his conversation with Investors Title with Horton and asked Horton how it would like to handle the title issues. Horton told Mr. Crowson that it had decided to terminate the Agreement. On 28 January 2008, Horton sent a letter terminating the Agreement pursuant to section 5(b) and section 40 of the Agreement.

On 25 August 2008, 42 East filed suit against Horton alleging that the company had breached the Agreement. The case was tried in a bench trial before Judge Robert H. Hobgood. At trial, 42 East did not argue that Horton violated any specific term of the Agreement, but rather contended that Horton had violated its duty of good faith and fair dealing.

Based on the above facts and additional contested findings that Mr. Crowson did not provide Investors Title with certain information, that Horton did not provide Mr. Crowson with pertinent information, that Horton could have obtained title insurance from another carrier without the Needham Path exception, and that Horton did not give 42 East an opportunity to obtain quitclaim deeds that would have removed the Needham Path exception, the trial court concluded that Horton "did not act in good faith and make a reasonable effort to obtain insurable title to the property as defined by the Lot Purchase Agreement. That constitutes a breach of the contract and places [Horton] in default of a condition or covenant of the contract." The trial court, therefore, awarded 42 East the $400,000.00 liquidated damages provided for in the Agreement, as well as interest since the filing of the complaint, for a total of $450,666.00. Horton timely appealed to this Court.

## Discussion

"The standard of review on appeal from a non-jury trial is 'whether there was competent evidence to support the trial court's findings of fact and whether its conclusions of law were proper in light of such facts.'" *East Mkt. St. Square, Inc. v. Tycorp Pizza IV, Inc.*, 175 N.C. App. 628, 632, 625 S.E.2d 191, 196 (2006) (quoting *Shear v. Stevens Bldg. Co.*, 107 N.C. App. 154, 160, 418 S.E.2d 841, 845 (1992)). We review the trial court's conclusions of law *de novo. Id.*

### I

[1] We first address Horton's contention that because the Agreement contained a "time is of the essence" clause, the parties were required to close by the deadline specified in the Agreement's Third Amendment. The Third Amendment had extended the "required closing date" for the first closing until 28 November 2007. According to Horton, when 42 East did not close by that date, the contract terminated, and the trial court should have entered judgment in favor of Horton on that basis.

42 East, in response, first asserts that Horton did not raise this issue at trial and, therefore, did not preserve it for appellate review. Based on our review of the record, it is apparent that Horton did argue at the trial level that the "time is of the essence" clause required judgment in Horton's favor. This issue is, therefore, properly before the Court.

**42 EAST, LLC v. D.R. HORTON, INC.**

[218 N.C. App. 503 (2012)]

When a "contract contain[s] a '[t]ime is of the essence' provision and plaintiff [does] not close within the required time frame, plaintiff's claim for breach of contract must fail." *S.N.R. Mgmt. Corp. v. Danube Partners 141, LLC*, 189 N.C. App. 601, 620, 659 S.E.2d 442, 455 (2008). A "time is of the essence" clause "clearly and unambiguously indicates that a definitive time to close [is] a vital and essential term to the contract." *Fairview Developers, Inc. v. Miller*, 187 N.C. App. 168, 173, 652 S.E.2d 365, 369 (2007).

A "time is of the essence" clause can, however, be waived. *Phoenix Ltd. P'ship of Raleigh v. Simpson*, 201 N.C. App. 493, 501, 688 S.E.2d 717, 723 (2009) (holding that "undisputed facts demonstrating that defendants not only never insisted on closing on the specified closing date, but made statements and took actions manifesting an intent that closing should occur at some unspecified later date establish that defendants waived the 'time is of the essence' clause"). As this Court has explained, " '[w]aiver is always based upon an express or implied agreement. There must always be an intention to relinquish a right, advantage or benefit. The intention to waive may be expressed or implied from acts or conduct that naturally leads the other party to believe that the right has been intentionally given up.' " *Fairview Developers*, 187 N.C. App. at 172, 652 S.E.2d at 368 (quoting *Patterson v. Patterson*, 137 N.C. App. 653, 667, 529 S.E.2d 484, 492 (2000)).

The trial court's order does not resolve the issues relating to Horton's "time is of the essence" argument, including whether any waiver occurred. The court had no need to address Horton's argument because it found that the parties had, in fact, agreed to a Fourth Amendment extending the initial closing date to 20 January 2008:

28. On December 18, 2007, Chris Crowson e-mailed Scott Morrison a proposed draft for the Fourth Amendment to the Lot Purchase Agreement. This proposed Amendment set a new closing date for January 20, 2008. Further, it extended the takedown schedule out an additional two years from March 2, 2010 to October 20, 2012. It further changed the takedown schedule for the Defendant by providing that it would purchase five lots per month rather than ten lots per month. These new projections were based on market studies done by the Defendant.

29. As of December 18, 2007, Gary Lynch, on behalf of the Plaintiff, and Scott Morrison and John Nance, Vice President of Land Acquisition and Development for Defendant, and Kurt

Burger, Regional Vice President of Defendant, had agreed to the terms of the Fourth Amendment.

On appeal, Horton argues that the trial court's finding of fact 29 is in error given section 34 of the Agreement. Section 34 provides that "[n]otwithstanding any other provision herein, neither this agreement nor any amendment hereto shall be a valid, binding and enforceable obligation of [Horton] unless and until such document is ratified in writing by" certain specified "corporate officer[s] of [Horton]." (Original in all capitals.) The individuals identified in the trial court's finding of fact as having agreed to the Fourth Amendment were not, however, included among those specified in section 34 as having authority to ratify an amendment. In any event, as Horton notes, the trial court's finding of fact does not establish that the agreement to the amendment was in writing.

Because the trial court's order does not address section 34, we cannot determine the basis under which the trial court concluded that the parties had agreed to the Fourth Amendment's terms. Moreover, 42 East does not provide this Court with any basis for upholding the trial court's finding of a valid agreement. Instead, it acknowledges that the Fourth Amendment was never executed and then argues that its proposal is nonetheless evidence of waiver of the "time is of the essence" clause. We must, therefore, remand to the trial court for additional findings of fact and conclusions of law regarding the issue whether the parties entered into a Fourth Amendment to the Agreement.

In the event that the trial court determines that no Fourth Amendment extension ever became effective, the trial court must then address whether Horton waived the "time is of the essence" clause. While Horton acknowledges that, as a general matter, a "time is of the essence" clause may be waived, it argues that section 30(k) of the Agreement and section 34 (discussed above) preclude any finding of an implied waiver. Section 30(k) of the Agreement provides

> k. Any failure or delay of [Horton] or [42 East] to enforce any term of this Agreement shall not constitute a waiver of such term, it being explicitly agreed that such a waiver must be specifically stated in a writing delivered to the other party in compliance with Section 16 above. Any such waiver by [Horton] or [42 East] shall not be deemed to be a waiver of any other breach or of a subsequent breach of the same or any other term.

It has, however, long been the law in North Carolina that

> [t]he provisions of a written contract may be modified *or waived* by a subsequent parol agreement, or by conduct which naturally and justly leads the other party to believe the provisions of the contract are modified or waived. This principle has been sustained even where the instrument provides for any modification of the contract to be in writing. . . . It has likewise been sustained where a contract contained a provision to the effect that "No salesman or agent of the company shall have the right to change or modify this contract."

*Whitehurst v. FCX Fruit & Vegetable Serv., Inc.*, 224 N.C. 628, 636, 32 S.E.2d 34, 39 (1944) (emphasis added) (quoting *H. M. Wade Mfg. Co. v. Lefkowitz*, 204 N.C. 449, 451, 168 S.E.2d 517, 517 (1933)). *See also Inland Constr. Co. v. Cameron Park II, Ltd.*, 181 N.C. App. 573, 577, 640 S.E.2d 415, 418 (2007) (accord). Our Supreme Court has specifically applied this reasoning with respect to a contract providing both that "time is of the essence" and that substantial modifications of the contract must be in writing. *See Childress v. C. W. Myers Trading Post, Inc.*, 247 N.C. 150, 156, 100 S.E.2d 391, 395 (1957) ("If the parties verbally assented to extend the time for the completion of the building to October, the parties would be bound thereby notwithstanding Section 3 of the contract which required 'substantial variations from the terms' to be in writing.").

We see no reason that these holdings by our Supreme Court and this Court should not apply with equal force to "no waiver" provisions such as the no waiver provision in the Agreement, especially given the Supreme Court's express reference to "waiver" in *Whitehurst*. As courts from other jurisdictions have observed:

> "The general view is that a party to a written contract can waive a provision of that contract by conduct expressly or surrounding performance, despite the existence of a so-called anti-waiver or failure to enforce clause in the contract." 13 *Williston on Contracts* § 39:36 (4th ed.2000). This is "based on the view that the nonwaiver clause itself, like any other term of the contract is subject to waiver by agreement or conduct during performance." *Id.*

*ASC Utah, Inc. v. Wolf Mountain Resorts, L.C.*, 2010 UT 65, 245 P.3d 184, 196 n.8 (2010). *See also Retail Developers of Ala., LLC v. E. Gadsden Golf Club, Inc.*, 985 So. 2d 924, 930 n.3 (Ala. 2007) ("This Court has consistently held that nonwaiver clauses and clauses that

require modifications to be in writing can be found to have been waived upon proper proof."); *Hovnanian Land Inv. Grp., LLC v. Annapolis Towne Ctr. at Parole, LLC*, 421 Md. 94, 121-22, 25 A.3d 967, 983 (2011) ("[T]he freedom to contract includes the freedom to alter that contract. [Plaintiff] was free, after signing the initial contract, to waive a condition for which it had bargained. *See, e.g.*, 8-40 Corbin on Contracts § 40.13 (2011) ('Parties to a contract cannot, even by an express provision in that contract, deprive themselves of the power to alter or vary or discharge it by subsequent agreement.'). Provisions in a contract which purport to limit this ability of parties to modify their contract, implicitly or explicitly, are disfavored. Accordingly, we agree with the Court of Special Appeals that a party may waive, by its actions or statements, a condition precedent in a contract, even when that contract has a non-waiver clause.").

We, therefore, hold that the non-waiver clause in the Agreement does not preclude a determination that Horton waived the "time is of the essence" clause. Whether or not Horton's conduct amounted to waiver is, however, a question of fact to be decided by the trial court. *See id.* at 122, 25 A.3d at 983 ("Yet, whether subsequent conduct of the parties amounts to a modification or waiver of their contract is generally a question of fact to be decided by the trier of fact." (internal quotation marks omitted)). Accordingly, if the trial court determines that the parties did not by amendment further extend the initial closing date, then the trial court must make findings of fact and conclusions of law addressing whether Horton waived the Agreement's "time is of the essence" clause.

## II

**[2]** Horton further contends that although it terminated the Agreement pursuant to both section 5 and section 40 of the Agreement, the trial court, in concluding that Horton "did not properly terminate the contract as allowed by the written contract documents," only addressed section 5. We agree.

Horton's letter purporting to terminate the Agreement asserted that the termination was because 42 East had "failed to cure the objections to title pursuant to Section 40 of the Agreement and Horton is unable to obtain insurable title to the Property pursuant to Section 5(b) of the Agreement." Horton, therefore, did act under both sections 5 and 40.

Section 5 imposed upon 42 East a duty to deliver to Horton "good and marketable fee simple title to the Property with a liability limit in

the amount of the Purchase Price at standard premium rates." On the other hand, section 40 of the contract required that 42 East deliver "evidence in a form acceptable to [Horton] that all of the objections to title to the Property listed in **Exhibit H** attached hereto and incorporated herein have been cured or removed."

"When the parties use clear and unambiguous terms, the contract should be given its plain meaning, and the court can determine the parties' intent as a matter of law." *Alaimo Family Chiropractic v. Allstate Ins. Co.*, 155 N.C. App. 194, 197, 574 S.E.2d 496, 498 (2002). " 'Since the object of construction is to ascertain the intent of the parties, the contract must be considered as an entirety. The problem is not what the separate parts mean, but what the contract means when considered as a whole.' " *Jones v. Casstevens*, 222 N.C. 411, 413-14, 23 S.E.2d 303, 305 (1942) (quoting *Paige on Contracts* § 1112). It is a basic principle of contract law that " '[a]ll parts of the contract will be given effect if possible.' " *Dysart v. Cummings*, 181 N.C. App. 641, 647, 640 S.E.2d 832, 836 (quoting *Int'l Paper Co. v. Corporex Constructors, Inc.*, 96 N.C. App. 312, 316, 385 S.E.2d 553, 556 (1989)), *aff'd per curium*, 361 N.C. 580, 650 S.E.2d 593 (2007).

In its order in this case, the trial court made several findings of fact regarding both sections 5 and 40, including quoting their terms and explaining how section 40 came to be added to the Agreement by an amendment. The trial court's conclusions of law also discussed section 40 extensively, concluding that it was a condition precedent; that "[t]he language of paragraph 40 of the Second Amendment did not give the Defendant unbounded discretion in the manner in which it addressed the title issues for the property"; and that "this discretion must be exercised in a reasonable manner based upon good faith and fair play."

However, the conclusions of law specifically addressing Horton's liability for breach of contract state only:

> 6. [Horton] did not act in good faith and make a reasonable effort to obtain insurable title to the property as defined by the Lot Purchase Agreement. That constitutes a breach of the contract and places the Defendant in default of a condition or covenant of the contract.

> 7. [Horton] did not properly terminate the contract as allowed by the written contract documents.

Conclusion of law 6 addresses only the contractual duty imposed by section 5 of the Agreement regarding the delivery of "good and marketable title," which is defined as "title that is insurable by the title insurance company designated by [Horton]."

Section 40 does not reference "good and marketable title" or "insurable title." Nowhere in the order does the trial court address whether, as required by section 40, 42 East provided to Horton "evidence in a form acceptable to [Horton] that all of the objections to title to the Property listed in **Exhibit H**" had been cured or removed or whether Horton waived this condition precedent. Further, although 42 East tried the case based on a theory that Horton breached the implied covenant of good faith and fair dealing, the order does not specifically address whether that implied covenant was violated in connection with section 40, as well as section 5. Although 42 East claims that "[i]nherent in this conclusion [of law 6] is that Horton failed to act in good faith with respect to Paragraph 40," we cannot agree given the specific language of conclusion of law 6 and the differing requirements of the two sections of the Agreement.

We note further that the trial court's finding of fact 5 states, after quoting section 5(b)(6), that "[Horton] was obligated to close under the Agreement if Plaintiff delivered insurable title as defined by the Agreement." Although this statement is included as part of a finding of fact, it is in fact a conclusion of law. *See In re Everette*, 133 N.C. App. 84, 85, 514 S.E.2d 523, 525 (1999) ("A 'conclusion of law' is a statement of the law arising on the specific facts of a case which determines the issues between the parties."). A conclusion of law mischaracterized as a finding of fact, will, on appeal, be treated as a conclusion of law and reviewed accordingly. *In re R.A.H.*, 182 N.C. App. 52, 60, 641 S.E.2d 404, 409 (2007).

The trial court's apparent belief, reflected in finding of fact 5, that delivery of insurable title was all that was required for closing explains the court's failure to address the specific terms of section 40. Because, however, all sections of the Agreement must be given effect, and nothing in the Agreement suggests that compliance with section 5 negates the requirements of section 40, the trial court was required to determine whether Horton properly terminated the contract under section 40 as well as section 5.

On appeal, 42 East makes various arguments regarding why Horton could not properly terminate the Agreement under section 40. Those arguments must, however, be considered by the trial court in

42 EAST, LLC v. D.R. HORTON, INC.

[218 N.C. App. 503 (2012)]

the first instance. As the trial court did not address whether Horton properly terminated the Agreement under section 40, we must remand the case to the trial court for further findings of fact and conclusions of law on that issue.

Horton further challenges the trial court's conclusions of law seemingly setting out the standard for determining whether Horton acted properly under section 40, even though it did not include any conclusion of law specifically addressing compliance with the duties under section 40. Conclusions of law 4 and 5 state:

> 4. The language of paragraph 40 of the Second Amendment did not give the Defendant unbounded discretion in the manner in which it addressed the title issues for the property.

> 5. Our Courts have repeatedly imposed a "reasonableness" standard in such situations in which the existence of rights and obligations is within the discretion of one of the parties. *MCI [Constructors,] Inc. v. Hazen & Sawyer P.C.*, 401 [F. Supp. 2d] 504 ([M.D.N.C. ]2005). Where a contract confers on one party a discretionary power affecting the rights of the other, this discretion must be exercised in a reasonable manner based upon good faith and fair play. *See [Mezzanotte] v. Freeland*, supra at 414.

Horton argues that to the extent the trial court concluded that the question was whether Horton acted reasonably in terminating the Agreement under section 40, that conclusion is contrary to North Carolina law.

In *Fulcher v. Nelson*, 273 N.C. 221, 224, 159 S.E.2d 519, 522 (1968), the Supreme Court addressed a contract that allowed the plaintiff to " 'trade back' " a car to the defendant if he was not satisfied with the car. After first noting that the plaintiff's "dissatisfaction *with the Cadillac*, as distinguished from general dissatisfaction with the terms of the trade, is the ground on which he asserts a contractual right to 'trade back[,]' " the Court held that "the contract conferred this right to 'trade back' if plaintiff's election was made in good faith on account of his dissatisfaction with the condition in which he found the Cadillac." *Id.*

*Fulcher* thus appears to hold that in deciding whether a party properly terminated a contract pursuant to a satisfaction clause, the question is whether the party acted in good faith. "Good faith"

depends on whether the party actually was dissatisfied regarding the condition falling within the party's discretion or whether the termination of the contract was due to some other reason, such as general dissatisfaction with the terms of the contract.

*Midulla v. Howard A. Cain Co.*, 133 N.C. App. 306, 515 S.E.2d 244 (1999), supports this interpretation of *Fulcher*. In *Midulla*, a contract for purchase of land provided that the plaintiffs' offer "was contingent on a '[r]eview of covenants and restrictions, the body of which are satisfactory to Buyer.' " *Id.* at 309, 515 S.E.2d at 246. This Court explained that, pursuant to this provision, the "plaintiffs had the discretion to cancel the Contract if they were not satisfied with the covenants and restrictions governing the area where the property was located. However, plaintiffs also had a duty to act in good faith." *Id.* The Court held that plaintiffs' evidence that they "believed that 'the covenants and restrictions exposed them to the risk of becoming obligated for payments in which they had an inadequate voice in approving' " was, under the terms of the contract, "an adequate reason to cancel the Contract." *Id.* at 310, 515 S.E.2d at 247. The Court held that in the absence of evidence supporting defendant's claim that plaintiffs cancelled the contract simply to avoid their contractual obligations, the plaintiffs were entitled to summary judgment. *Id.*

*Fulcher* and *Midulla*, therefore, focus on whether the party exercising discretion acted in good faith and not whether the party acted reasonably. The cases relied upon by the trial court in its conclusion of law are not to the contrary. The decision by the United States District Court for the Middle District of North Carolina in *MCI Constructors* is not controlling authority, and to the extent that it suggests that a reasonableness standard applies in reviewing a party's exercise of discretion, it misapprehends controlling North Carolina law.

*Mezzanotte v. Freeland*, 20 N.C. App. 11, 200 S.E.2d 410 (1973), upon which *MCI Constructors* is largely based and which the trial court also cited, does not—and could not—overrule *Fulcher* and is not contrary to *Midula*. It involved a contract for the purchase and sale of land that was conditioned on the plaintiff's obtaining financing satisfactory to itself. The defendants argued that this agreement, hinging on the plaintiff's finding the financing satisfactory, was illusory. In rejecting this argument, this Court held:

> The contract implies that plaintiffs would in good faith seek proper financing from NCNB and that such financing in keeping with reasonable business standards could not be rejected

at the personal whim of plaintiffs but only for a satisfactory cause. Where a contract confers on one party a discretionary power affecting the rights of the other, this discretion must be exercised in a reasonable manner based upon good faith and fair play. . . . A promise conditioned upon an event within the promisor's control is not illusory if the promisor also 'impliedly promises to make reasonable effort to bring the event about or to use good faith and honest judgment in determining whether or not it has in fact occurred.' 1 Corbin on Contracts, § 149, at 659.

*Id.* at 17, 200 S.E.2d at 414-15.

In other words, *Mezzanotte* involves two prongs. First, the plaintiff was required to make reasonable efforts to obtain financing. Second, any rejection of that financing had to be for "satisfactory cause" after " 'us[ing] good faith and honest judgment.' " *Id.* (quoting 1 *Corbin on Contracts*, § 149, at 659) *See also Dysart*, 181 N.C. App. at 648-49, 640 S.E.2d at 837 (applying *Mezzanote* and holding that when plaintiffs had discretionary power to terminate contract for purchase of land if estimated costs of repair exceeded $10,000.00, plaintiffs acted "in a reasonable manner and in good faith and fair play" when they promptly arranged for home inspection within time frame specified in contract).

*Mezzanotte and Dysart* (as affirmed by the Supreme Court), therefore, require a determination whether Horton acted in a reasonable manner with respect to receipt of 42 East's "evidence . . . that all of the objections to title to the Property listed in **Exhibit H** . . . have been cured or removed"—that is the event referred to in *Mezzanotte*. In considering Horton's determination that it was dissatisfied with this evidence, the trial court must determine whether Horton acted in good faith and in the exercise of honest judgment, as set out in *Fulcher, Midulla,* and *Mezzanotte. See also Ledbetter Bros., Inc. v. N.C. Dep't of Transp.*, 68 N.C. App. 97, 104, 314 S.E.2d 761, 766 (1984) ("Under our law such 'satisfaction' provisions clearly invest the inspecting party with discretionary power to reject, subject only to restrictions of good faith.").

III

[3] Finally, Horton contends that certain of the trial court's findings of fact are unsupported by the evidence. We note first that 42 East has, as to these findings of fact, argued—consistent with the standard of review—that "the existence of contrary evidence does not mean

that the findings at issue are not properly supported . . . ." However, 42 East has not specifically pointed to any evidence that supports the portions of the findings that Horton challenges. It is not adequate for a party to assert that a finding is supported by evidence without including citations to the record and that evidence.

Nonetheless, it is well established that " '[f]acts found under misapprehension of the law will be set aside on the theory that the evidence should be considered in its true legal light.' " *Concerned Citizens of Brunswick Cnty. Taxpayers Ass'n v. State ex rel. Rhodes*, 329 N.C. 37, 46, 404 S.E.2d 677, 683 (1991) (quoting *Helms v. Rea*, 282 N.C. 610, 620, 194 S.E.2d 1, 8 (1973)). Since the trial court made its findings of fact under a misapprehension of law—that the issue was only whether Horton failed to act in good faith and make a reasonable effort to obtain insurable title to the property—we must vacate the order and remand so that the trial court can consider the evidence in light of both section 5 and section 40.

We note that as to many of the challenged findings of fact, Horton seems to be contending primarily that they are incomplete in that they fail to take into account certain uncontested evidence or, because of the omission of certain facts, they are misleading. On the other hand, whether other findings challenged by Horton are unsupported depends upon how the order is interpreted. For example, Horton contends that the trial court's finding that Horton did not give 42 East "the opportunity to obtain the necessary quitclaim deeds" is inconsistent with the fact that 14 months elapsed between the date that Horton first notified 42 East of the objections to title and when Horton terminated the Agreement. The order can, however, be read as finding that Horton should have given 42 East an opportunity to cure the title objections after sending the letter of default. We believe that all of these issues regarding the findings of fact can better be addressed by the trial court on remand.

Because, however, the scope of the remand could be affected by Horton's challenges to the trial court's findings relating to a title insurance policy 42 East obtained from Old Republic Title Insurance Company, we address the sufficiency of the evidence supporting those findings. Finding of fact 47 provided in pertinent part that "[o]n August 6, 2006, the Plaintiff provided the Defendant with a copy of a 17.4 million dollar title insurance policy from Old Republic Title Insurance Company that contained the following 'temporary exception' with respect to the Needham Path . . . ." Finding of Fact 48 fur-

ther found that "[t]he Old Republic Title Insurance Company policy exception for the Needham Path provided that it would be deleted upon completion of the roads for the project which were completed on January 16, 2008." The trial court then found that Horton did not provide its attorney, Mr. Crowson, with a copy of the Old Republic policy (finding of fact 49) and that Horton "could have obtained title insurance for the property from Old Republic National Title Insurance Company without the Needham Path exception but the Defendant did not provide a copy of the Old Republic policy to its attorney Chris Crowson and he was not aware of the fact that Old Republic had previously issued a policy for the property."

The record does not support the trial court's finding that 42 East provided Horton with a copy of the Old Republic policy. Significantly, 42 East has pointed to no evidence supporting that portion of the finding. Instead, testimony presented at trial, along with the documentary exhibits in this case, show that 42 East only provided the Old Republic commitment to Horton and not the insurance policy itself. That commitment evidenced title exceptions for the Needham Pathway and that 18' Cart Path that were at issue in clearing the title for closing. As Horton did not have a copy of the Old Republic policy, it could not have provided the policy to its closing attorney, Chris Crowson, contrary to findings of fact 49 and 50.

In addition, the trial court's findings of fact indicating that the temporary exception for Needham Path would be deleted upon completion of the roads is not wholly correct. The Old Republic policy also included a permanent exception for "[b]uilding restriction lines, easements and any other facts shown on plat(s) recorded in Book of Maps 63, Page 232; Book 64, Page 294; Book 67, Page 16 & 256; and Book 52, Page 407, Johnston County Registry." The plats to which the exception refers contain the Needham Pathway and 18' Cart Path, and testimony established that because of the permanent exception, the Needham Path exception would survive even after completion of the roads. Therefore, to the extent that the trial court found that Horton could have obtained title insurance from Old Republic without the Needham Path exception, that finding is not supported by the evidence.

These findings of fact are material to the trial court's conclusion that Horton "did not act in good faith and make a reasonable effort to obtain insurable title to the property as defined by the Lot Purchase Agreement." While the record contains evidence that could support the trial court's conclusion that Horton did not properly terminate the contract under section 5, we cannot assume that the trial court would

have reached the same decision in the absence of its findings regarding the Old Republic title insurance policy. On remand, the trial court must, therefore, also revisit its conclusion of law regarding section 5.

Conclusion

We, therefore, vacate the order below and remand for further findings of fact and conclusions of law. The trial court is free to revisit those findings, although it is not required to do so, with the exception of the portions of the findings related to the Old Republic title insurance policy discussed above. *See Friend-Novorska v. Novorska*, 143 N.C. App. 387, 393-94, 545 S.E.2d 788, 793 (holding that when appellate court vacates trial court judgment and order, that judgment and order is "void and of no effect:" on remand; trial court is "free to reconsider the evidence before it and to enter new and/or additional findings of fact based on the evidence, with the exception that the trial court [i]s bound on remand by any portions of the . . . order affirmed by this Court"), *aff'd per curiam*, 354 N.C. 564, 556 S.E.2d 294 (2001). We stress, however, that nothing in this opinion is intended to express any view on what conclusion the trial court should reach.

Vacated and Remanded.

Chief Judge MARTIN and Judge BEASLEY concur.