Recurrent Energy Dev. Holdings, LLC v. SunEnergy1, LLC, 2017 NCBC 18.

| STATE OF NORTH CAROLINA | IN THE GENERAL COURT OF JUSTICE |
| | SUPERIOR COURT DIVISION |
| MECKLENBURG COUNTY | 16 CVS 15107 |

| | | |
|---|---|---|
| RECURRENT ENERGY DEVELOPMENT HOLDINGS, LLC, | ) ) ) | |
| Plaintiff, | ) ) | **ORDER AND OPINION ON PLAINTIFF'S MOTION FOR PARTIAL** |
| v. | ) ) | **JUDGMENT ON THE PLEADINGS AND MOTION TO STRIKE OR DISMISS** |
| SUNENERGY1, LLC, | ) ) | **COUNTERCLAIM** |
| Defendant. | ) ) ) | |

**THIS MATTER** is before the Court on Plaintiff's motion for partial judgment on the pleadings (the "Rule 12(c) Motion") and motion to strike (the "Motion to Strike") or, in the alternative, to dismiss the counterclaim (the "Rule 12(b)(6) Motion") filed on December 29, 2016 as a single motion. The Rule 12(c) Motion, Motion to Strike, and Rule 12(b)(6) Motion are collectively referred to herein as the "Motions." For the reasons set forth below, the Court hereby **DENIES** the Motions.

*Poyner Spruill, LLP, by Cynthia L. Van Horne, Lee A. Spinks, and Sarah L. DiFranco, for Plaintiff.*

*Robinson, Bradshaw & Hinson, P.A., by John R. Wester, Douglas M. Jarrell, and Fitz E. Barringer, for Defendant.*

Robinson, Judge.

## I. PROCEDURAL HISTORY

2. The Court sets forth here only those portions of the procedural history relevant to its determination of the Motions.

3.     Plaintiff Recurrent Energy Development Holdings, LLC ("Plaintiff" or "Recurrent") initiated this action by filing its complaint on August 23, 2016.  This case was designated as a mandatory complex business case by order of the Chief Justice of the Supreme Court of North Carolina dated August 26, 2016 and assigned to the undersigned by order of Chief Business Court Judge James L. Gale dated August 29, 2016.

4.     On September 9, 2016, Plaintiff filed its Amended Complaint ("Complaint").

5.     On November 9, 2016, Defendant SunEnergy1, LLC ("Defendant" or "SunEnergy") filed its answer.

6.     On November 30, 2016, Plaintiff filed a motion for partial judgment on the pleadings and brief in support.

7.     On December 9, 2016, Defendant filed its first amended answer and counterclaim ("Answer" or "Counterclaim").

8.     On December 29, 2016, Plaintiff filed the Motions and a supporting brief seeking judgment on the pleadings as to certain of its claims for relief, and to strike or dismiss the Counterclaim.  The Motions have been fully briefed, and the Court held a hearing on the Motions on February 21, 2017.  The Motions are now ripe for resolution.

## II.     FACTUAL BACKGROUND

### A.     Rule 12(c) Motion

9.     The Court does not make findings of fact on a motion for judgment on the pleadings under Rule 12(c) of the North Carolina Rules of Civil Procedure ("Rule(s)"),

but only recites the factual allegations of the Answer and the undisputed factual allegations of the Complaint.

10. Recurrent is a Delaware limited liability company ("LLC") with its principal place of business in California. (Am. Compl. ¶ 1 [hereinafter Compl.]; First Am. Answer & Countercl. 10, ¶ 2 [hereinafter Answer].)

11. SunEnergy is a North Carolina LLC with its principal place of business in North Carolina. (Compl. ¶ 2; Answer 2, ¶ 2.)

12. Recurrent and SunEnergy are in the business of developing solar energy projects. (Compl. ¶¶ 1–2; Answer 2, 10.)

### 1. The Projects

13. Recurrent expressed interest in buying, and SunEnergy desired to sell, all of the assets necessary for the development of two solar energy projects in North Carolina (the "Proposed Transaction"), one in Bertie County (the "Aulander Project") and the other in Gates County (the "Haslett Project") (collectively, the "Project(s)"). (Compl. ¶ 3; Answer 2, ¶ 3.)

14. On or about February 11, 2016, Recurrent and SunEnergy executed a Confidential Letter of Intent (the "LOI"). (Compl. ¶ 4; Answer 3, ¶ 4.) The LOI set forth the parties' agreement on certain matters pending consummation of the Proposed Transaction. (Compl. Ex. A, ¶ C [hereinafter LOI].)

15. Under the terms of the LOI, Recurrent had the right to pay $2 million to SunEnergy in connection with each Project to secure a twelve-month exclusivity period during which SunEnergy agreed not to engage in any activity that would effect

a disposition of the assets of the Project for which payment had been made (the "Exclusivity Payment"). (LOI ¶ 1.)

16.    For each Project, the LOI set forth target development milestones by which SunEnergy was to achieve certain objectives with respect to the Projects (the "TDM"). (LOI ¶ 3.) With respect to both Projects, the TDM required the following:

- Issuance of administrative permits twenty-one days prior to the agreed upon notice-to-proceed date;

- Lease agreement in final form and issuance of discretionary permits by August 30, 2016;

- Executable Interconnection Services Agreement and Construction Services Agreement by September 1, 2016; and

- A clean title report by September 30, 2016. (LOI Annex B.)

The Aulander Project TDM additionally required wetlands delineation by April 30, 2016 and an executed option to lease additional land by June 30, 2016. (LOI Annex B.)

17.    Paragraph 3 of the LOI provided that

[i]n the event that [SunEnergy] fails to achieve the [TDM] for a Project . . . , [Recurrent] shall have the right, by written election to [SunEnergy], to purchase all of the assets necessary to develop, construct and operate one of the projects set forth in Annex C . . . or a project subsequently identified and developed by [SunEnergy] (a "Replacement Project"). [SunEnergy] shall provide said Replacement Project, which shall be chosen at [Recurrent]'s sole discretion, to [Recurrent] within 5 business days of [Recurrent]'s written election.

(LOI ¶ 3.)

18.     Except as specifically provided in paragraph 4 of the LOI, the Exclusivity Payment was non-refundable.  (LOI ¶ 4a.)  Paragraph 4b of the LOI provided that if SunEnergy "fails to achieve the [TDM] for a Project . . . due to a wetlands issue with such Project, then 100% of the Exclusivity Payment for the applicable Project will be refunded to [Recurrent] within sixty (60) days of the date of [Recurrent]'s written election."  (LOI ¶ 4b.)

19.     Paragraph 4c of the LOI provided that

> [i]n the event [SunEnergy] fails to provide a Replacement Project as provided in [paragraph] 3 with the same MWac capacity as the original Project, then 37.5% of the Exclusivity Payment for the applicable Project will be refunded to [Recurrent] within sixty (60) days of the date of [Recurrent]'s written election.

(LOI ¶ 4c.)

20.     Paragraph 4d of the LOI provided that

> [i]n the event [SunEnergy] provides a Replacement Project as provided in [paragraph] 3, but [SunEnergy] fails to achieve the [TDM] . . . with respect to such Replacement Project or it becomes evident . . . that such Replacement Project is not able to be developed and constructed to achieve commercial operation on or before December 31, 2017, then 37.5% of the Exclusivity Payment for the applicable Project will be refunded to [Recurrent] within sixty (60) days of December 31, 2017.

21.     As of the date of the LOI, three replacement projects with the same MWac capacity as the Projects were specifically identified and exclusively available to Recurrent in the event that SunEnergy failed to achieve the TDM for either Project (the "Replacement Project(s)"): Moyock Solar, LLC ("Moyock"); Shawboro East Ridge Solar, LLC; and Hobbsville Solar, LLC.  (LOI Annex C.)

22. On or about February 11, 2016, Recurrent made a $2 million Exclusivity Payment to SunEnergy for the Aulander Project (the "Aulander Exclusivity Payment") and a $2 million Exclusivity Payment to SunEnergy for the Haslett Project (the "Haslett Exclusivity Payment"). (Compl. ¶ 10; Answer 3, ¶ 10.)

23. According to SunEnergy, "the [Aulander Project] could not proceed at its planned size because of wetlands issues with the project site." (Answer 3, ¶ 11.) A wetlands survey revealed that a percentage of the Aulander Project site was located in an area that would be considered jurisdictional wetlands by the United States Army Corps of Engineers. (Compl. ¶ 12; Answer 3–4, ¶ 12.) Thus, the site was unsuitable for a solar energy facility with the MWac capacity that was planned for the site. (Answer 4, ¶ 12.)

24. SunEnergy alleges that, at some time prior to May 2, 2016, Recurrent "effectively made a written election to proceed" with the Moyock Replacement Project, rather than the Aulander Project. (Answer 4, ¶ 13.)

25. On May 2, 2016, Recurrent gave written notice to SunEnergy demanding a full refund of the Aulander Exclusivity Payment. (Compl. ¶ 14, Ex. B; Answer 4, ¶ 14.)

26. On July 13, 2016, Recurrent gave written notice to SunEnergy asserting that SunEnergy had failed to comply with the LOI by failing to refund the Aulander Exclusivity Payment. (Compl. ¶ 22, Ex. E; Answer 5, ¶ 22.)

27. SunEnergy has not refunded the Aulander Exclusivity Payment. (Compl. ¶ 34; Answer 7, ¶ 34.)

28. SunEnergy could not obtain a special use permit for the Haslett Project because of a moratorium on the issuance of special use permits or construction of solar projects in Gates County. (Answer 4, ¶ 16.)

29. On August 31, 2016, Recurrent gave written notice to SunEnergy asserting that SunEnergy had failed to meet the August 30, 2016 TDM for the Haslett Project and requesting that SunEnergy provide a Replacement Project within one day. (Compl. ¶ 17, Ex. C; Answer 4, ¶ 17.) The Moyock Replacement Project was available to Recurrent as a Replacement Project for the Haslett Project. (Answer 5, ¶ 18.)

30. On September 8, 2016, Recurrent gave written notice to SunEnergy demanding a 37.5% refund of the Haslett Exclusivity Payment. (Compl. ¶ 20, Ex. D; Answer 5, ¶ 20.) Recurrent alleges that the refund was due by November 7, 2016, which was after the Complaint was filed, but SunEnergy denies that allegation. (Compl. ¶ 20; Answer 5, ¶ 20.)

## 2. The Fee Letter

31. In addition to the provisions concerning the Projects, the LOI contained a provision regarding a potential tax equity transaction (the "Tax Equity Provision"). (LOI ¶ 14.) The Tax Equity Provision stated that Recurrent and SunEnergy "shall use best efforts to negotiate in good faith for [Recurrent] to provide a 2016 tax-equity investment in the Williamson [sic] Speight solar photovoltaic project being developed and constructed by [SunEnergy] in Martin County" (the "Tax Equity Transaction"). (LOI ¶ 14.)

32.     Pursuant to the Tax Equity Provision, Recurrent and SunEnergy executed a fee letter (the "Fee Letter") dated June 3, 2016.  (Compl. ¶ 24, Ex. F; Answer 6, ¶ 24.)  The Fee Letter stated, in relevant part, that

> [r]eference is made to the [Tax Equity Provision of] the LOI, dated as of February 11, 2016 . . . .
>
> In accordance with [the Tax Equity Provision], [Recurrent] . . . and [SunEnergy] and Kenny Habul . . . are negotiating a potential Tax Equity Transaction.  In connection with the foregoing, . . . [SunEnergy] agrees as follows:
>
> (a) [SunEnergy] will cause its affiliate that is the managing member of the tax equity partnership to reimburse [Recurrent] for all reasonable and documented costs and expenses incurred by [Recurrent] in connection with the Tax Equity Transaction, including, without limitation, any fees and other costs and expenses paid or payable to (i) Foley & Lardner LLP, as transaction counsel to [Recurrent] and Parker Poe Adams & Bernstein LLP, . . . but only up to an aggregate amount of $275,000, (ii) Black & Veatch International Company, . . . (iii) Ernst & Young LLP, . . . (iv) Moore-McNeil, LLC, . . . and (v) such other third party advisors engaged by [Recurrent] with the approval of [SunEnergy or Kenny Habul], and
>
> (b) without limiting the foregoing, within two (2) business days of the date hereof, [SunEnergy] will cause [Recurrent] to be provided a non-refundable deposit of $50,000 to be applied by [Recurrent] to legal costs incurred by [Recurrent] in connection with the Tax Equity Transaction . . . .
>
> For the avoidance of doubt, if, for any reason, the managing member of the tax equity partnership is unable to reimburse [Recurrent] for the amounts described in (a) above, [SunEnergy] hereby agrees to reimburse [Recurrent] directly for all such amounts within the timeframes set forth in this fee letter.  The amounts required to be paid pursuant to clause (a) above will be payable . . . on the earlier of:
>
> (x) the date of the first funding under the Tax Equity Transaction; and
>
> (y) fifteen (15) business days following the date that (i) [Recurrent] or [SunEnergy] has provided notice to the other that it has

decided not to proceed with the Tax Equity Transaction and (ii) [Recurrent] has made a written demand for such amounts . . . .

(Compl. Ex. F.) The Fee Letter was signed by Kenny Habul, SunEnergy's Chief Executive Officer and President, on behalf of SunEnergy. (Compl. Ex. F.)

33. As of June 22, 2016, Recurrent had expressed a desire to purchase the project associated with the Tax Equity Transaction rather than proceed with the Tax Equity Transaction. (Answer 6, ¶ 25.)

34. By letter to SunEnergy dated July 19, 2016, Recurrent demanded reimbursement for $73,543.19 in costs and expenses incurred in connection with the Tax Equity Transaction. (Compl. ¶ 26, Ex. G; Answer 6, ¶ 26.)

35. On August 9, 2016, Recurrent gave written notice to SunEnergy that SunEnergy was in default for failing to timely reimburse Recurrent's costs and expenses incurred in connection with the Tax Equity Transaction. (Compl. ¶ 27, Ex. H; Answer 6, ¶ 27.)

36. SunEnergy has not reimbursed Recurrent's costs and expenses incurred in connection with the Tax Equity Transaction. (Compl. ¶ 34; Answer 7, ¶ 34.)

### B. Rule 12(b)(6) Motion

37. The Court does not make findings of fact on the Rule 12(b)(6) Motion, but only recites those factual allegations of the Counterclaim that are relevant and necessary to the Court's determination of the Rule 12(b)(6) Motion.

38. In its Counterclaim, SunEnergy alleges that, as part of Recurrent's consideration in exchange for the exclusive rights to the Projects, Recurrent agreed to the Tax Equity Provision, which required Recurrent to "use best efforts to negotiate

[the Tax Equity Transaction] in good faith." (LOI ¶ 14.) Tax benefits can be claimed on new solar projects, like the Projects here, but few solar developers can use tax benefits. (Answer 10, ¶ 4.) As a result, solar developers barter the tax benefits to a tax equity investor in exchange for a portion of the capital necessary to cover the project cost. (Answer 10, ¶ 4.)

39. On or about June 7, 2016, Recurrent and SunEnergy entered into a term sheet (the "Term Sheet") in furtherance of the Tax Equity Transaction. (Answer 10–12; Mem. Supp. Mot. Partial J. Pleadings & Mot. Strike or Dismiss Countercl. Ex. 1 [hereinafter Term Sheet].) The Term Sheet set forth the parameters for a partnership flip transaction by which Recurrent would make a tax-equity investment in the Williamston Speight solar photovoltaic project referred to in the Tax Equity Provision (the "Williamston Project"). (Answer 11, ¶ 6; Term Sheet 1.) In exchange, Recurrent would be allocated an investment tax credit under Section 48(a) of the Internal Revenue Code (the "Federal ITC"). (Answer 11, ¶ 6; Term Sheet 1.) The Term Sheet stated that certain matters were still under discussion and that Recurrent's "ability to sign definitive agreements and to proceed with funding [was] contingent upon, among other things, [Recurrent]'s completion of a customary due diligence process." (Term Sheet 1 n.2.) The Term Sheet further stated that Recurrent "[had] not guaranteed that it will be able to complete such a process by the dates set forth [in the Term Sheet]." (Term Sheet 1 n.2.) The Term Sheet also provided that its "terms and economic indication are made based on the information provided by [Kenny Habul] without regard to the accuracy of the information provided and

remains [sic] subject to, among other things, appropriate documentation, due diligence and the review of tax counsel." (Term Sheet 2.) Additionally, the Term Sheet stated that "Recurrent reserves the right to procure additional tax equity participants and propose alternate financing structures provided the terms, and the additional tax equity participants, are acceptable to all parties herein." (Term Sheet 2.)

40. The Term Sheet stated that Kenny Habul owns Williamston Speight Solar, LLC (the "Project Company"), which owns the rights to the Williamston Project (Term Sheet 1), and that Recurrent and SunEnergy agreed to form an LLC (the "Holding Company") for the purpose of owning the Project Company. (Term Sheet 1–2.) The Holding Company was to be the sole member and manager of the Project Company. (Term Sheet 2.) Recurrent and Kenny Habul, or an affiliate of Kenny Habul, were to be the members of the Holding Company. (Term Sheet 2.) SunEnergy or an affiliate of Kenny Habul would also be the managing member of the Holding Company (the "Managing Member"), subject to certain control and voting rights of Recurrent. (Term Sheet 2.)

41. With respect to Recurrent's funding commitment, the Term Sheet stated that SunEnergy was:

> to provide updated [Federal] ITC basis assumption; Recurrent anticipates funding ratio of 1.25x the projected [Federal] ITC (assuming costs are covered). The purchase price for the [Williamston] Project will be the lesser of (a) [$]1.88 per watt and (b) the fair market value of the eligible property as determined by appraisal.

(Term Sheet 2 n.4.) The Term Sheet further provided that the Federal ITC received by Recurrent, and Recurrent's total capital contributions, were still to be determined, but that it was expected that Recurrent's total capital contributions would be made in two installments. (Term Sheet 2–3.) The first installment would be 20% of Recurrent's total capital contributions and would be made upon satisfaction of seventeen conditions precedent, which were still under discussion. (Term Sheet 3–4.) The second installment would be 80% of Recurrent's total capital contributions and would be made upon satisfaction of thirteen conditions precedent. (Term Sheet 3–5.)

42. For the seven-year period beginning on the date that the Williamston Project was placed in service, the income, gain, loss, deduction, and credits of the Holding Company would be allocated 99% to Recurrent and 1% to the Managing Member. (Term Sheet 5.) Thereafter, net income or net loss of the Holding Company would be allocated 5% to Recurrent and 95% to the Managing Member. (Term Sheet 5.) The Term Sheet also provided that, for the five-year period beginning on the date that Recurrent paid its second installment of its total capital contributions, Recurrent would receive priority cash distributions from the Holding Company. (Term Sheet 6.) The priority cash distribution amounts were subject to change such that Recurrent would receive "a pre-tax cash and [Federal] ITC internal rate of return over the expected economic life of the [Williamston] Project of not less than 2.0%." (Term Sheet 6 n.10.)

43. Further, the Term Sheet stated that, for the 180-day period beginning five years after the date that Recurrent paid its second installment of its total capital

contributions, the Managing Member would have an option to purchase Recurrent's membership interest in the Holding Company. (Term Sheet 7.)

44.    The Term Sheet provided that

> [i]f the terms herein are generally acceptable to you, please sign below and return along with the legal expense deposit in the amount of $50,000 by May __, 2016. The term sheet will expire at 5:00 p.m. on that date if we fail to receive the aforementioned signatures and agreed upon deposit.

(Term Sheet 12.) SunEnergy alleges that it signed the Term Sheet and wired Recurrent $50,000. (Answer 11–12.)

45.    SunEnergy alleges that beginning in June 2016, Recurrent unilaterally demanded to reduce the purchase price of the Williamston Project to a price below its fair market value and below SunEnergy's development costs for the Williamston Project. (Answer 12, ¶ 10.) SunEnergy alleges that Recurrent's unilateral demand was in violation of its obligation under the LOI to use its best efforts to negotiate the Tax Equity Transaction in good faith. (Answer 12–13.)

46.    As a result, SunEnergy alleges it had to maintain, and later extend, short-term financing for the Williamston Project and enter into a new financing arrangement. (Answer 12, ¶ 11.) Further, SunEnergy alleges that it lost half a year during which construction of the Williamston Project was largely completed and SunEnergy did not pursue an alternative tax equity transaction or market the Williamston Project elsewhere. (Answer 12–13, ¶ 12.) As a tax equity investor must own an interest in a project before the project is placed in service in order for the tax equity investor to share in the Federal ITC on the project, SunEnergy alleges that it

was forced to forego revenue from electricity sales while SunEnergy stalled on the remaining construction of the Williamston Project in order to give Recurrent time to close the Tax Equity Transaction. (Answer 12–13.) SunEnergy further alleges that, as a result of Recurrent's wrongful conduct, it was deprived of the opportunity to engage in an alternative tax equity transaction. (Answer 12–13.) The Tax Equity Transaction did not close. (Answer 6, 9, 12–13.)

### C. Claims for Relief

47. Recurrent brings the following claims against SunEnergy: (1) a declaratory judgment action; (2) a claim for breach of the LOI; and (3) a claim for breach of the Fee Letter. (Compl. 8, 10, 12.) SunEnergy brings a counterclaim against Recurrent for breach of the LOI, alleging that Recurrent breached the Tax Equity Provision by unilaterally deciding to reduce the purchase price of the Williamston Project to an amount below the project's fair market value and below SunEnergy's development costs. (Answer 13, ¶¶ 15–16.)

### D. The Motions

48. Plaintiff's Rule 12(c) Motion seeks judgment on the pleadings in the amount of $2 million on Recurrent's claim that SunEnergy breached the LOI by failing to refund the Aulander Exclusivity Payment (the "Aulander Project Claim"), $750,000 on Recurrent's claim that SunEnergy breached the LOI by failing to refund 37.5% of the Haslett Exclusivity Payment (the "Haslett Project Claim"), and $73,543.19 on Recurrent's claim that SunEnergy breached the Fee Letter (the "Fee Letter Claim").

Plaintiff's Motion to Strike and Rule 12(b)(6) Motion seek to strike or, in the alternative, dismiss the Counterclaim.

### III. LEGAL STANDARD

#### A. Rule 12(c)

49. "A motion for judgment on the pleadings should not be granted unless the movant clearly establishes that no material issue of fact remains to be resolved and that he is entitled to judgment as a matter of law." *Carpenter v. Carpenter*, 189 N.C. App. 755, 761, 659 S.E.2d 762, 767 (2008). On a Rule 12(c) motion, "[t]he movant is held to a strict standard and must show that no material issue of facts exists and that he is clearly entitled to judgment." *Ragsdale v. Kennedy*, 286 N.C. 130, 137, 209 S.E.2d 494, 499 (1974). "[T]he court cannot select some of the alleged facts as a basis for granting the motion on the pleadings if other allegations, together with the selected facts, establish material issues of fact." *J. F. Wilkerson Contracting Co. v. Rowland*, 29 N.C. App. 722, 725, 225 S.E.2d 840, 842 (1976). The Court must read the pleadings in the light most favorable to the nonmoving party, and

> [a]ll well pleaded factual allegations in the nonmoving party's pleadings are taken as true and all contravening assertions in the movant's pleadings are taken as false. All allegations in the nonmovant's pleadings, except conclusions of law, legally impossible facts, and matters not admissible in evidence at the trial, are deemed admitted by the movant for purposes of the motion.

*Ragsdale*, 286 N.C. at 137, 209 S.E.2d at 499 (citations omitted).

50. "Judgment on the pleadings is not favored by the law . . . ." *Huss v. Huss*, 31 N.C. App. 463, 466, 230 S.E.2d 159, 162 (1976). The function of Rule 12(c) "is to dispose of baseless claims or defenses when the formal pleadings reveal their lack of

merit." *Ragsdale*, 286 N.C. at 137, 209 S.E.2d at 499. "[J]udgment on the pleadings is not appropriate merely because the claimant's case is weak and he is unlikely to prevail on the merits." *Huss*, 31 N.C. App. at 469, 230 S.E.2d at 163. "A motion for judgment on the pleadings is allowable only where the pleading of the opposite party is so fatally deficient in substance as to present no material issue of fact . . . ." *George Shinn Sports, Inc. v. Bahakel Sports, Inc.*, 99 N.C. App. 481, 486, 393 S.E.2d 580, 583 (1990).

**B.     Rule 12(b)(6)**

51.     In ruling on a motion to dismiss pursuant to Rule 12(b)(6), the Court reviews the allegations of the Counterclaim in the light most favorable to Defendant. The Court's inquiry is "whether, as a matter of law, the allegations of the [Counterclaim], treated as true, are sufficient to state a claim upon which relief may be granted under some legal theory." *Harris v. NCNB Nat'l Bank of N.C.*, 85 N.C. App. 669, 670, 355 S.E.2d 838, 840 (1987). The Court construes the Counterclaim liberally and accepts all allegations as true. *Laster v. Francis*, 199 N.C. App. 572, 577, 681 S.E.2d 858, 862 (2009).

52.     Where the Counterclaim refers to and depends on certain documents, the Court may consider those documents without converting the motion into one for summary judgment under Rule 56. *Schlieper v. Johnson*, 195 N.C. App. 257, 261, 672 S.E.2d 548, 551 (2009). At the same time, the Court may not consider materials that are not mentioned, contained, or attached in or to the Counterclaim; otherwise, a Rule 12(b)(6) motion will be converted into a Rule 56 motion and subject to its

standards of consideration and review. *Fowler v. Williamson*, 39 N.C. App. 715, 717, 251 S.E.2d 889, 890–91 (1979).

53. Dismissal of a claim pursuant to Rule 12(b)(6) is proper "(1) when the [Counterclaim] on its face reveals that no law supports [the] claim; (2) when the [Counterclaim] reveals on its face the absence of fact sufficient to make a good claim; [or] (3) when some fact disclosed in the [Counterclaim] necessarily defeats the . . . claim." *Oates v. JAG, Inc.*, 314 N.C. 276, 278, 333 S.E.2d 222, 224 (1985); *see also Jackson v. Bumgardner*, 318 N.C. 172, 175, 347 S.E.2d 743, 745 (1986). Otherwise, the Counterclaim "should not be dismissed for insufficiency unless it appears to a certainty that [Defendant] is entitled to no relief under any state of facts which could be proved in support of the claim." *Sutton v. Duke*, 277 N.C. 94, 103, 176 S.E.2d 161, 166 (1970) (emphasis omitted).

## IV. ANALYSIS

### A. Rule 12(c) Motion

54. As a preliminary matter, the Court must determine which state's law applies to the parties' claims. The LOI and the Fee Letter contain a New York choice of law clause. (LOI ¶ 9; Compl. Ex. F.) North Carolina courts have stated that a contractual choice of law provision will be given effect unless the chosen state has no substantial connection to the transaction and there is no other reasonable basis for the parties' choice, or the law of the chosen state violates a fundamental public policy of North Carolina. *Cable Tel Servs., Inc. v. Overland Contracting, Inc.*, 154 N.C. App. 639, 642–43, 574 S.E.2d 31, 33–34 (2002).

55.     Here, all parties agree that North Carolina law applies despite the New York choice of law clauses because the LOI and the Fee Letter have no connection to New York.  The Court agrees that, on the record before the Court, neither the LOI nor the Fee Letter have any connection to New York.  The parties to the LOI and the Fee Letter are a Delaware LLC with its principal place of business in California and a North Carolina LLC with its principal place of business in North Carolina.  Both the LOI and the Fee Letter concern solar projects under construction and development in North Carolina.  Further, the record before the Court does not provide any basis for the parties' New York choice of law clauses.

56.     "[T]he interpretation of a contract is governed by the law of the place where the contract was made."  *Id.* at 642, 574 S.E.2d at 33.  "[T]he test of the place of a contract is as to the place at which the last act was done by either of the parties essential to a meeting of minds."  *Szymczyk v. Signs Now Corp.*, 168 N.C. App. 182, 187, 606 S.E.2d 728, 733 (2005) (quoting *Bundy v. Commercial Credit Co.*, 200 N.C. 511, 515, 157 S.E. 860, 862 (1931)).

57.     The record before the Court indicates that the LOI and the Fee Letter were sent by Recurrent to SunEnergy, and the LOI and the Fee Letter required SunEnergy to sign the contracts.  (LOI ¶ 15; Compl. Ex. F.)  Thus, the record before the Court indicates that the LOI and the Fee Letter were made in North Carolina, and therefore, the Court agrees with the parties that North Carolina law applies to the parties' claims on those contracts.  *Szymczyk*, 168 N.C. App. At 187, 606 S.E.2d at 733 ("[T]he last act of signing the contract was an essential element to formation.");

*Cable Tel Servs., Inc.*, 154 N.C. App. At 643, 574 S.E.2d at 34 (applying North Carolina law where plaintiff signed the contract in North Carolina and returned it to defendant in Kansas).

### 1. Aulander Project Claim

58. Recurrent contends that it is entitled to a full refund of the Aulander Exclusivity Payment because SunEnergy failed to meet the TDM for the Aulander Project due to a wetlands issue.

59. "The elements of a claim for breach of contract are (1) existence of a valid contract and (2) breach of the terms of that contract." *Poor v. Hill*, 138 N.C. App. 19, 26, 530 S.E.2d 838, 843 (2000). A valid contract requires assent, mutuality of obligation, and definite terms. *Charlotte Motor Speedway, LLC v. Cty. Of Cabarrus*, 230 N.C. App. 1, 7, 748 S.E.2d 171, 176 (2013). "Generally, letters of intent are found to be unenforceable agreements to agree when relied upon to enforce the contemplated transaction." *Insight Health Corp. v. Marquis Diagnostic Imaging of N.C., LLC*, 2016 NCBC LEXIS 77, at *13 (N.C. Super. Ct. Oct. 7, 2016) (concluding a letter of intent was not a valid contract where its plain language made clear that it was not a binding agreement); *Remi Holdings, LLC v. WR 3023 HSBC Way L.P.*, 2016 NCBC LEXIS 110, at *10 (N.C. Super. Ct. Dec. 12, 2016) (same).

60. Here, the plain language of the LOI makes clear that, while titled a "Letter of Intent" rather than a "Contract" or "Agreement," the LOI was in fact a binding agreement, and the parties do not dispute this conclusion. The LOI set forth the parties' "agreement on certain matters pending consummation of the Proposed

Transaction." (LOI ¶ C.) The LOI obligated both parties and expressly provided that "[t]ermination of this LOI shall not relieve either Party from any liability for breach of the binding terms of this LOI occurring prior to such termination." (LOI ¶ 8.) Further, the terms of the LOI are sufficiently definite to be enforceable, and the parties' assented to the LOI by signing it.

61. Therefore, the Court concludes that the LOI is a valid contract. The remaining issue for decision on Plaintiff's Rule 12(c) Motion is whether the pleadings, as interpreted according to controlling law, establish that SunEnergy breached the LOI.

62. Under the LOI, Recurrent is entitled to a 100% refund of the Exclusivity Payment for a Project if (1) SunEnergy failed to meet the TDM for the Project, (2) such failure was due to a wetlands issue, and (3) Recurrent made a written election for a refund. (LOI ¶ 4b.) The LOI also provides that if SunEnergy failed to meet the TDM for a Project, Recurrent had the right, by written election to SunEnergy, to purchase a Replacement Project. (LOI ¶ 3.)

63. It is undisputed that Recurrent made the Aulander Exclusivity Payment, and that the Aulander Project "could not proceed at its planned size because of wetlands issues with the project site." (Compl. ¶¶ 10–11; Answer 3, ¶¶ 10–11.) Further, it is undisputed that Recurrent gave written notice to SunEnergy on May 2, 2016 demanding a full refund of the Aulander Exclusivity Payment, and that SunEnergy has not refunded the Aulander Exclusivity Payment. (Compl. ¶¶ 14, 34; Answer 4, 7.)

64. Recurrent contends that SunEnergy's admission that the Aulander Project could not proceed at its planned size because of wetlands issues constitutes an admission that SunEnergy failed to meet the TDM for the Aulander Project. (Mem. in Supp. 9.) Taking Recurrent's contention as true, the Court nevertheless concludes that Recurrent has failed to satisfy its burden to show that no material issue of fact exists that SunEnergy breached the LOI by failing to refund the Aulander Exclusivity Payment. SunEnergy denies that it breached the LOI by not refunding the Aulander Exclusivity Payment. (Compl. ¶¶ 13, 15; Answer 4, ¶¶ 13, 15.) SunEnergy alleges that it offered multiple Replacement Projects to Recurrent and that before Recurrent elected a refund, Recurrent "effectively made a written election to proceed with" the Moyock Replacement Project instead of the Aulander Project. (Answer 4, ¶ 13.) As a result, SunEnergy contends that Recurrent did not have the right to elect a refund of the Aulander Exclusivity Payment. (Answer 4, ¶ 14.)

65. On the other hand, Recurrent argues that its right to elect a Replacement Project under paragraph 3 of the LOI is independent of its right to elect a full refund of the Exclusivity Payment under paragraph 4b. More specifically, Recurrent argues that even if it "effectively made a written election" for the Moyock Replacement Project under paragraph 3, Recurrent is still entitled to a full refund of the Aulander Exclusivity Payment under paragraph 4b. (Mem. in Supp. 10.)

66. "Interpreting a contract requires the court to examine the language of the contract itself for indications of the parties' intent at the moment of execution." *State v. Philip Morris USA Inc.*, 363 N.C. 623, 631, 685 S.E.2d 85, 90 (2009). "Since the

object of construction is to ascertain the intent of the parties, the contract must be considered as an entirety. The problem is not what the separate parts mean, but what the contract means when considered as a whole." *42 E., LLC v. D.R. Horton, Inc.*, 218 N.C. App. 503, 513, 722 S.E.2d 1, 8 (2012) (quoting *Jones v. Casstevens*, 222 N.C. 411, 413–14, 23 S.E.2d 303, 305 (1942)). The Court's task is to harmonize and give effect to all clauses, if possible. *Philip Morris USA Inc.*, 363 N.C. at 632, 685 S.E.2d at 91. The contract is to be construed consistently with reason and common sense. *Variety Wholesalers, Inc. v. Salem Logistics Traffic Servs., LLC*, 365 N.C. 520, 525, 723 S.E.2d 744, 748 (2012). When a contract is plain and unambiguous, the Court can determine the parties' intent as a matter of law. *42 E., LLC*, 218 N.C. App. at 513, 722 S.E.2d at 8. If a contract is ambiguous, however, interpretation of the contract is a question of fact for the jury. *Variety Wholesalers, Inc.*, 365 N.C. at 525, 723 S.E.2d at 748. An ambiguity exists when the effect of provisions is uncertain or capable of several reasonable interpretations. *Id.*

67. Under Recurrent's interpretation of the LOI, if SunEnergy failed to meet the TDM for a Project due to a wetlands issue, Recurrent could elect a Replacement Project under paragraph 3 of the LOI *and* elect to receive a full refund of the Exclusivity Payment for that Project under paragraph 4b. In contrast, under SunEnergy's interpretation of the LOI, if SunEnergy failed to meet the TDM for the Aulander Project due to a wetlands issue, Recurrent could either elect a Replacement Project under paragraph 3 of the LOI *or* elect to receive a full refund of the Aulander

Exclusivity Payment under paragraph 4b. (SunEnergy's Mem. in Opp'n to Pl.'s Mot. 9–10.)

68. Under SunEnergy's interpretation, paragraphs 3, 4c, and 4d would not apply if Recurrent elected a full refund under paragraph 4b; Recurrent would receive a full refund of the Aulander Exclusivity Payment and still have the exclusive rights to the Haslett Project in exchange for the Haslett Exclusivity Payment. On the other hand, if Recurrent elected a Replacement Project in lieu of a full refund, and SunEnergy either failed to provide a Replacement Project or failed to achieve the TDM for the Replacement Project, Recurrent would be refunded 37.5% of the Aulander Exclusivity Payment under paragraph 4c or 4d, respectively.

69. If, however, as Recurrent urges, Recurrent could elect both a Replacement Project for the Aulander Project and a full refund of the Aulander Exclusivity Payment, the partial refund of that Exclusivity Payment contemplated under paragraphs 4c and 4d would be arguably meaningless and without effect. Moreover, Recurrent's interpretation is arguably inconsistent with the consideration given and received by the parties. Indeed, if Recurrent elected both a Replacement Project for the Aulander Project and a full refund of the Aulander Exclusivity Payment, assuming *arguendo* that SunEnergy met the TDM for the Haslett Project, Recurrent would in effect receive the exclusive rights to two Projects: the Replacement Project and the Haslett Project, in exchange for making the Exclusivity Payment for just one Project.

70. In short, the Court concludes that, based on the record before it and construing the LOI as a whole, the LOI does not plainly and unambiguously give Recurrent the right to elect both a Replacement Project for the Aulander Project under paragraph 3 and a full refund of the Aulander Exclusivity Payment under paragraph 4b. Based on the Court's interpretation of the LOI at this stage of the proceeding, SunEnergy's allegation that Recurrent elected the Moyock Replacement Project before Recurrent elected a full refund leads the Court to conclude that Recurrent has failed to show as a matter of law that SunEnergy breached the LOI by failing to refund the Aulander Exclusivity Payment. Therefore, the Rule 12(c) Motion as to the Aulander Project Claim is denied.

### 2. Haslett Project Claim

71. Recurrent contends that it is entitled to a 37.5% refund of the Haslett Exclusivity Payment because SunEnergy failed to meet the TDM and, upon demand for a Replacement Project, failed to respond to Recurrent's request for a Replacement Project.

72. Under the LOI, Recurrent is entitled to a 37.5% refund of the Exclusivity Payment for a Project if (1) SunEnergy failed to meet the TDM for the Project, (2) Recurrent made a written election to SunEnergy to purchase a Replacement Project, (3) SunEnergy failed to provide a Replacement Project, and (4) Recurrent made a written election to SunEnergy for a refund. (LOI ¶¶ 3, 4c.)

73. It is undisputed that Recurrent made the Haslett Exclusivity Payment, a written election to SunEnergy to purchase a Replacement Project, and a written

election to SunEnergy for a 37.5% refund of the Haslett Exclusivity Payment. (Compl. ¶¶ 10, 17, 20; Answer 3–5.)

74.     Recurrent alleges that "SunEnergy has failed to meet the August 30, 2016 and September 1, 2016" TDM for the Haslett Project. (Compl. ¶ 16.) There were two August 30, 2016 TDMs for the Haslett Project: the "[i]ssuance of all discretionary local land use permits, state or federal permits required"; and a final lease agreement. (LOI Annex B.) The September 1, 2016 TDM for the Haslett Project was an Interconnection Services Agreement and Construction Services Agreement. (LOI Annex B.) SunEnergy admits that "a special use permit for the Haslett Project could not be obtained because of a moratorium on the issuance of special use permits or construction of solar projects in Gates County." (Answer 4, ¶ 16.) SunEnergy denies the remainder of Recurrent's allegation. (Answer 4, ¶ 16.)

75.     The Court concludes that a material issue of fact exists on the pleadings as to whether SunEnergy failed to meet the TDM for the Haslett Project. SunEnergy's admitted failure to obtain a special use permit does not appear to implicate the September 1, 2016 TDM for an Interconnection Services Agreement and Construction Services Agreement. Moreover, SunEnergy's admission that it could not obtain a special use permit, without more, is not an admission that it failed to the meet the August 30, 2016 TDM that required issuance of all discretionary permits. There was a separate Haslett Project TDM for obtaining administrative permits, "[i]ncluding permits that directly relate to the construction of the facility, including, without limitation, building, grading, electrical and section 401 state permits," which had to

be completed twenty-one days prior to the agreed upon notice-to-proceed date that was assumed to be April 19, 2017. (LOI Annex B.) On the record before the Court, it is unclear whether the special use permit SunEnergy failed to obtain was a permit that fell within the August 30, 2016 TDM or the notice-to-proceed TDM. If the special use permit fell within the notice-to-proceed TDM, SunEnergy did not fail to meet the TDM by failing to obtain it by August 30, 2016 and Recurrent was not entitled to elect a Replacement Project or a refund of the Haslett Exclusivity Payment.

76. Even construing SunEnergy's admission as an admission that it failed to meet the Haslett Project TDM, SunEnergy denies that it failed and refused to respond to Recurrent's request for a Replacement Project. (Compl. ¶ 18; Answer 5, ¶ 18.) Recurrent alleges that it gave written notice to SunEnergy of SunEnergy's failure to meet the Haslett Project TDM and requested that SunEnergy provide a Replacement Project. (Compl. ¶ 17.) SunEnergy admits that Recurrent gave written notice to SunEnergy in which Recurrent asserted that SunEnergy had failed to meet the Haslett Project TDM and requested that SunEnergy provide a Replacement Project. (Answer 4, ¶ 17.) Recurrent next alleges that "SunEnergy breached the LOI by failing and refusing to respond in any manner whatsoever to [Recurrent]'s request for a Replacement Project." (Compl. ¶ 18.) SunEnergy denies this allegation and alleges that Recurrent was fully aware that the Moyock Replacement Project was available to Recurrent as a Replacement Project. (Answer 5, ¶ 18.) Thus, taking SunEnergy's allegations as true and Recurrent's contravening allegations as false, as the Court

must on a Rule 12(c) motion, there is also a material issue of fact as to whether SunEnergy failed to respond to Recurrent's request for a Replacement Project.

77.     As a result, the Court concludes that Recurrent has failed to satisfy its burden to show that no material issue of fact exists that SunEnergy breached the LOI with respect to the Haslett Project and that Recurrent is entitled to a 37.5% refund of the Haslett Exclusivity Payment as a matter of law.  Therefore, the Rule 12(c) Motion as to the Haslett Project Claim is denied.

### 3.     Fee Letter Claim

78.     Recurrent contends that it is entitled to reimbursement under the Fee Letter for its costs and expenses incurred in connection with the Tax Equity Transaction.

79.     Under the Fee Letter, Recurrent is entitled to reimbursement of certain costs and expenses incurred in connection with the Tax Equity Transaction on the earlier of: (1) the date of the first funding under the Tax Equity Transaction; or (2) fifteen business days following the date that (a) Recurrent or SunEnergy provides notice to the other that it has decided not to proceed with the Tax Equity Transaction, and (b) Recurrent makes a written demand for reimbursement.  (Compl. Ex. F.)

80.     Recurrent alleges that SunEnergy notified Recurrent on or about June 22, 2016 that SunEnergy decided not to proceed with the Tax Equity Transaction; however, SunEnergy denies that allegation.  (Compl. ¶ 25; Answer 6, ¶ 25.)  At the hearing on the Motions, counsel for Recurrent argued that Recurrent was still entitled to judgment on the pleadings on the Fee Letter Claim because, under the

terms of the Fee Letter, Recurrent is entitled to reimbursement regardless of which party decides not to proceed with the Tax Equity Transaction. While the Fee Letter provides that Recurrent is entitled to reimbursement if Recurrent notifies SunEnergy that it has decided not to proceed with the Tax Equity Transaction, Recurrent does not allege that it provided SunEnergy any such notice. The basis on which Recurrent claims it is entitled to reimbursement under the Fee Letter is SunEnergy's notification that SunEnergy had decided not to proceed with the Tax Equity Transaction, and SunEnergy denies that allegation.

81. Therefore, the Court concludes that Recurrent has failed to satisfy its burden to show that no material issue of fact exists that SunEnergy breached the Fee Letter and that Recurrent is entitled to reimbursement of its expenses as a matter of law. Thus, the Rule 12(c) Motion as to the Fee Letter Claim is denied.

### B. Motion to Strike

82. Recurrent moves to strike SunEnergy's Counterclaim on the basis that SunEnergy was required under Rule 13(f) to seek leave of court before amending its answer to add a counterclaim. SunEnergy argues that it properly amended its answer to add a counterclaim as a matter of course under Rule 15(a).

83. Rule 13(f) provides that "[w]hen a pleader fails to set up a counterclaim through oversight, inadvertence, or excusable neglect, or when justice requires, he may by leave of court set up the counterclaim by amendment." N.C. Gen. Stat. § 1A-1, Rule 13(f). Rule 15(a) provides that "[a] party may amend his pleading once as a matter of course at any time before a responsive pleading is served or, if the pleading

is one to which no responsive pleading is permitted . . . , he may so amend it at any time within 30 days after it is served." N.C. Gen. Stat. § 1A-1, Rule 15(a).

84. SunEnergy filed its amended Answer and Counterclaim thirty days after it filed its original answer, and therefore it is timely under Rule 15(a). The issue for decision is whether SunEnergy was required to seek leave of court under Rule 13(f) before amending its answer to add the Counterclaim.

85. The North Carolina Rules are modeled after the Federal Rules of Civil Procedure ("Federal Rule(s)"). *Sutton v. Duke*, 277 N.C. 94, 99, 176 S.E.2d 161, 164 (1970). Decisions under the Federal Rules are pertinent for guidance in interpreting the North Carolina Rules, and it is customary for North Carolina courts to look to such decisions in interpreting the North Carolina Rules. *Bryson v. Sullivan*, 330 N.C. 644, 655, 412 S.E.2d 327, 332 (1992); *Dickens v. Puryear*, 302 N.C. 437, 442, 276 S.E.2d 325, 329 (1981).

86. Prior to the 2009 amendments to the Federal Rules, Federal Rule 13(f) was substantially similar to North Carolina Rule 13(f). Federal Rule 13(f) provided that "[t]he court may permit a party to amend a pleading to add a counterclaim if it was omitted through oversight, inadvertence, or excusable neglect or if justice so requires." Fed. R. Civ. P. 13(f) (abrogated 2009). Federal Rule 15(a) similarly allowed a party to amend its pleading, to which no responsive pleading was required, once as a matter of course within twenty days after it was served. Fed. R. Civ. P. 15(a) (amended 2009). Therefore, federal decisions interpreting Federal Rules 13(f) and

15(a) prior to the 2009 amendments are instructive on this Court's interpretation of Rules 13(f) and 15(a) of the North Carolina Rules.

87. The case law on the interplay between a party's right to amend its pleading once as a matter of course under Federal Rule 15(a) and a party's right to add a counterclaim by leave of court under Federal Rule 13(f) is scant. It appears, however, that the majority of courts that addressed the issue under the version of Federal Rule 13 in effect prior to 2009 concluded that a party may amend its answer to add a counterclaim as a matter of course under Federal Rule 15(a), and that leave of court under Federal Rule 13(f) was only required after the period for amendment under Federal Rule 15(a) had expired. *Deutsch v. Health Ins. Plan*, 573 F. Supp. 1443, 1445 (S.D.N.Y. 1983) ("[Federal] Rule 13(f) requires leave of the [c]ourt to add omitted counterclaims only where [Federal Rule] 15(a) does not allow an amendment as a matter of right. There is no apparent reason that a pleading filed within the time periods prescribed in [Federal Rule] 15(a) should require leave of the court merely because it contains a counterclaim."); *A.J. Indus., Inc. v. United States Dist. Court for Cent. Dist.*, 503 F.2d 384, 388 (9th Cir. 1974) ("[W]e see no reason why [Federal] Rule 15(a) should not apply with [Federal] Rule 13(f) coming into force after the [expiration of the time for amendment as a matter of course].")); *Banco Para El Comercio Exterior de Cuba v. First Nat'l City Bank*, 744 F.2d 237, 243 (2d Cir. 1984) (discussing the interplay between Federal Rules 15 and 13(f) in the context of relation back of amendments and stating that it construes Federal Rule 13(f) to allow amendment as a matter of course to add a counterclaim under Federal Rule 15(a));

*Perfect Plastics Indus., Inc. v. Cars & Concepts, Inc.*, 758 F. Supp. 1080, 1083 (W.D. Pa. 1991) (same).

88.     A few other courts, however, reached the opposite conclusion. *Marlin v. Chase Cardmember Servs.*, 1:09cv0192 AWI DLB, 2009 U.S. Dist. LEXIS 45189, at *13–14 (E.D. Cal. May 19, 2009) (declining to consider defendant's motion to amend as a matter of course under Federal Rule 15(a) and instead applying Federal Rule 13(f)); *Sweeney v. Allen*, 494 F. Supp. 2d 818, 821 (S.D. Ohio 2006) (stating that Federal Rule 13(f) provides a remedy for adding a counterclaim by amendment that is separate from Federal Rule 15(a), and that a party must seek leave of court under Federal Rule 13(f) to add a counterclaim by amendment).  In concluding that Federal Rule 15(a) does not allow a party to amend its pleading to add a counterclaim as a matter of course, these cases relied on the Sixth Circuit's decision in *Stoner v. Terranella*, 372 F.2d 89 (6th Cir. 1967).  *E.g.*, *Sweeney*, 494 F. Supp. 2d at 821 (solely relying on *Stoner*); *Marlin*, 2009 U.S. Dist. LEXIS 45189, at *14 (relying on *Stoner* and *Sweeney*).

89.     In *Stoner*, defendant filed its answer to plaintiff's complaint.  More than twenty days thereafter, and two months after the statute of limitations on defendant's potential counterclaim had run, defendant filed a motion for leave to file an amended answer and counterclaim.  *Stoner*, 372 F.2d at 90.  The district court denied the motion with respect to defendant's counterclaim because the counterclaim was barred by the statute of limitations.  Defendant appealed, arguing that his counterclaim arose out of the conduct, transaction, or occurrence set forth in his original answer,

and thus that his counterclaim related back to the date of his original answer pursuant to Federal Rule 15(c). The sole question for decision was whether Federal Rule 15(c) applied to defendant's amended pleading.

90. The Sixth Circuit noted that neither the parties nor the lower court relied on Federal Rule 13(f) and stated that

> it is clear that [Federal Rule 13(f)] provides a remedy for setting up omitted counterclaims which is separate and apart from the remedy provided in [Federal] Rule 15(a) dealing with pleading amendments in general. While [Federal] Rule 13(f) provides that an omitted counterclaim may be set up only by leave of court, under [Federal] Rule 15 a pleading may be amended at any time within 20 days after it is served "if the pleading is one to which no responsive pleading is permitted [e.g., an answer only, without a counterclaim] . . . ." Thus, the courts which have passed upon *motions for leave* to file amended pleadings embracing previously omitted counterclaims have generally considered only [Federal] Rule 13(f), and not [Federal] Rule 15.

*Id.* at 91 (alteration and omission in original) (emphasis added). The court did not address whether a party may amend its pleading to add a counterclaim as a matter of course under Federal Rule 15(a). Rather, the court pointed out that Federal Rule 15(a) provides that an answer without a counterclaim—as a pleading to which no responsive pleading is permitted—may be amended within twenty days after it is served. The court went on to address *motions for leave* to amend under Federal Rules 15(a) and 13(f)—not amendments as a matter of course—and concluded that Federal Rule 13(f), rather than Federal Rule 15(a), applies to motions for leave to amend to add a counterclaim. The Sixth Circuit concluded that

> the remedies provided by the two rules are mutually exclusive in the sense that an amendment asserting a previously omitted counterclaim, *such as was attempted in the instant case*, is made pursuant to [Federal] Rule 13(f) and not [Federal] Rule 15(a). Consequently, since [Federal]

> Rule 15(c) is applicable only to amendments made pursuant to [Federal] Rule 15(a), amendments made pursuant to [Federal] Rule 13(f) do not relate back to the original pleadings.

*Id.* (emphasis added) (citation omitted).

91.     The Court does not read *Stoner* as concluding that a party may not amend its pleading to add a counterclaim as a matter of course under Federal Rule 15(a). The court in *Stoner* was not confronted with that issue as defendant sought to amend its answer to add a counterclaim more than twenty days after his answer was served. Instead, the Court reads *Stoner* as concluding that a party who seeks leave of court to amend its pleading to add a counterclaim—after expiration of the period for amendment as a matter of course under Federal Rule 15(a)—does so pursuant to Federal Rule 13(f), rather than Federal Rule 15(a). As a result, the Sixth Circuit concluded that Federal Rule 15(c), which provides for relation back of amendments under Federal Rule 15(a), does not apply to motions for leave to amend to add a counterclaim under Federal Rule 13(f). *See A.J. Indus., Inc.*, 503 F.2d at 388 ("In [*Stoner*] the Sixth Circuit held that *leave* to add omitted counterclaims was governed exclusively by [Federal] Rule 13(f). Several lower courts have also considered this problem and have followed the *Stoner* result. . . . However in those cases the courts were not faced with the question of whether a counterclaim could have been added as a matter of right before a responsive pleading had been filed. In each of those cases the responsive pleading had been filed and the parties were seeking to come under the portion of the rule that requires leave of the court." (emphasis added)).

92.    This interpretation of *Stoner* is consistent with the cases on which it relied, which all concerned motions for leave to amend to add counterclaims outside the period for amendment as a matter of course under Federal Rule 15(a). *Kirbens v. Wodis*, 295 F.2d 372, 375 (7th Cir. 1961) (affirming district court's order denying a motion for leave to amend to add a counterclaim under Federal Rule 13(f) when the motion was filed after defendant moved for summary judgment and summary judgment was granted in plaintiff's favor); *Runkle v. Kimny*, 266 F.2d 689, 691, 693 (D.C. Cir. 1959) (affirming district court's order denying a motion for leave to amend to add a counterclaim under Federal Rule 13(f) when the motion was filed three months after defendant filed his answer); *Safeway Trails, Inc. v. Allentown & Reading Transit Co.*, 185 F.2d 918, 919–20 (4th Cir. 1950) (affirming district court's order granting a motion for leave to amend to add a counterclaim under Federal Rule 13(f) when the motion was filed forty-seven days after defendant filed his answer).

93.    The 2009 amendments to the Federal Rules, which deleted Federal Rule 13(f), confirm that amendment as a matter of course under Federal Rule 15(a) was always intended to apply to amendments to add counterclaims.  The advisory committee notes on the 2009 amendments state that "[Federal] Rule 13(f) is deleted as largely redundant and potentially misleading.  An amendment to add a counterclaim will be governed by [Federal] Rule 15."  Fed. R. Civ. P. 13, Notes of Advisory Committee on 2009 amendments; *see also* Fed. R. Civ. P. 15, Notes of Advisory Committee on 2009 amendments ("Abrogation of [Federal] Rule 13(f)

establishes [Federal] Rule 15 as the sole rule governing amendment of a pleading to add a counterclaim.").

94. Finding the foregoing persuasive, the Court concludes that Rule 13(f) of the North Carolina Rules does not preclude a party from amending its pleading to add a counterclaim as a matter of course under Rule 15(a). Therefore, SunEnergy's amended Answer and Counterclaim was procedurally proper as an amendment as a matter of course under Rule 15(a), and the Motion to Strike the Counterclaim is denied.

### C.  Rule 12(b)(6) Motion

95. SunEnergy brings a Counterclaim for breach of the Tax Equity Provision of the LOI. (Answer 13.) SunEnergy alleges that Recurrent failed to use best efforts to negotiate the Tax Equity Transaction in good faith by "unilaterally insist[ing] on artificially limiting the tax basis for the [Williamston Project] to an amount below fair market value and even below [SunEnergy]'s costs to develop the project." (Answer 13, ¶ 15.) Recurrent argues that SunEnergy's Counterclaim should be dismissed because the Tax Equity Provision is an unenforceable agreement to agree. (Mem. in Supp. 17.)

96. The seminal North Carolina case on agreements to agree is *Boyce v. McMahan*, 285 N.C. 730, 208 S.E.2d 692 (1974), which stated that "a contract to enter into a future contract must specify all its material and essential terms, and leave none to be agreed upon as a result of future negotiations." *Boyce*, 285 N.C. at 734, 208 S.E.2d at 695. Further, "the parties must assent to the same thing in the same

sense, and their minds must meet as to all the terms. If any portion of the proposed terms is not settled, or no mode agreed on by which they may be settled, there is no agreement." *Id.*

97. The Court has concluded, and the parties do not dispute, that the LOI is a valid, binding contract. Recurrent's position appears to be, however, that the Tax Equity Provision is a severable provision that is an unenforceable agreement to agree. (Mem. in Supp. 17.) SunEnergy argues that the Tax Equity Provision is enforceable as an express agreement by the parties to use their best efforts to negotiate in good faith, citing *RREF BB Acquisitions, LLC v. MAS Props., L.L.C.*, 2015 NCBC LEXIS 61 (N.C. Super. Ct. June 9, 2015) in support. (Mem. in Opp'n 21–22.)

98. In *RREF*, the court held that defendants' claim for breach of a duty to negotiate in good faith may be viable based on the parties' course of negotiations, the substantial number of terms on which the parties reached an agreement, and a third-party defendant's words and conduct. *Id.* at *57. The court explained that a preliminary agreement to negotiate does not bind the parties to the substantive terms of the final agreement, nor does it bind the parties to consummate a final agreement—an agreement to negotiate only obligates the parties to negotiate all terms in good faith. *Id.* at *53–54. As North Carolina implies in every contract a duty of good faith and fair dealing, the court in *RREF* "s[aw] no reason that an agreement to continue negotiating in good faith would not be enforceable, provided that it met all of the requirements for contract formation under North Carolina law." *Id.* at *57.

99. The Court acknowledges that the Court in *RREF* was faced with a matter of first impression under North Carolina law, and that the North Carolina appellate courts have not addressed whether North Carolina law recognizes a claim for breach of an agreement to negotiate in good faith. *Insight Health Corp.*, 2016 NCBC LEXIS 77, at *6, *10.

100. At the same time, however, North Carolina case law is clear that the Court's task is to interpret the parties' contract in accordance with the parties' intent as discerned from the language of the contract—the Court does not have the power to rewrite the contract. *Beverage Sys. of the Carolinas, LLC v. Associated Beverage Repair, LLC*, 368 N.C. 693, 699–700, 784 S.E.2d 457, 462 (2016) (citing *Penn v. Standard Life Ins. Co.*, 160 N.C. 399, 402, 76 S.E. 262, 263 (1912)). Here, unlike the parties in *RREF*, the parties *expressly* agreed—as part of a binding contract—that Recurrent and SunEnergy "shall use best efforts to negotiate [the Tax Equity Transaction] in good faith." (LOI ¶ 14.)

101. The Tax Equity Provision is a definite term, by which the parties intended to be bound, requiring the parties to "use best efforts to negotiate in good faith." SunEnergy further alleges that the Tax Equity Provision was part of the consideration for SunEnergy's grant of exclusivity under the LOI. (Answer 10, ¶ 3.)

102. Based on the express terms of the Tax Equity Provision, the Court concludes that the allegations of the Counterclaim sufficiently plead the existence of a valid agreement between the parties to use their best efforts to negotiate in good faith.

103. The Court notes that Plaintiff argues that the Term Sheet, in addition to the LOI, is an unenforceable agreement to agree. (Mem. in Supp. 18–19.) SunEnergy's Counterclaim, however, is not for breach of the Term Sheet; rather, it is for breach of the LOI. Thus, the Court does not find persuasive Plaintiff's arguments based on the Term Sheet.

104. Therefore, the Court concludes that the allegations of the Counterclaim are sufficient to state a claim for breach of the LOI at the Rule 12(b)(6) stage, and the Rule 12(b)(6) Motion is denied. The Court notes that, in denying the Rule 12(b)(6) Motion, the Court has not yet been required to address the very significant issue of what relief might be authorized by an express contractual commitment to negotiate in good faith, and how such relief contrasts with that allowed if there had been a binding commitment to all necessary terms of a final agreement.

## V. CONCLUSION

105. **THEREFORE**, for the foregoing reasons, the Court **DENIES** the Motions.

**SO ORDERED**, this the 7th day of March, 2017.

/s/ Michael L. Robinson

Michael L. Robinson
Special Superior Court Judge
  for Complex Business Cases